## MARGARET P. SNOW *vs.* WALLACE J. HUTCHINS.

Worcester.    October 3, 1893. — November 27, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & LATHROP, JJ.

*Writ of Entry — Equitable Estoppel created by Acts of Demandant.*

A. conveyed, through a third person, to B., his wife, without valuable consideration, certain land which was part of his homestead estate. About fourteen years afterwards, A. conveyed the same land to C. by warranty deed, B. releasing her dower and homestead rights therein, and A. receiving in exchange therefor from C. a farm, which he soon after sold and conveyed, B. also joining in the deed in release of dower and homestead. C., soon after the conveyance to him, took possession of the land, and subsequently cut grass, picked apples, cut down apple trees, paid taxes, built a cellar wall, and did other work in preparation for building a house. During this time, B. lived within sight of the premises, and gave no intimation to C. that she claimed to own the land, for seven years after the conveyance to him. Three years later, she brought a writ of entry against him, at the trial of which she testified that, during those seven years, she did not know that he claimed the land; but there was other evidence, including evidence of declarations by her, tending to show her knowledge. *Held*, that, upon the question of equitable estoppel, there was evidence entitling C. to go to the jury.

WRIT OF ENTRY, dated January 20, 1892, to recover a parcel of land in Fitchburg. Plea, *nul disseisin*, with a specification of defence, among others, that the demandant was estopped in equity to maintain the action, and that the tenant was entitled to unconditional relief against the same; and also setting up a claim for improvements. Trial in the Superior Court, before *Braley*, J., who allowed a bill of exceptions, in substance as follows.

It appeared that the demanded premises were formerly owned by Benjamin Snow, who was the husband of the demandant,

and were part of his homestead estate, the whole estate comprising about two or three acres, the dwelling-house and connected buildings being near the centre; that on July 9, 1868, Snow conveyed the homestead estate to his wife, the demandant, through one James F. Munroe, without any financial consideration, under circumstances hereinafter stated; that these conveyances from Snow to Munroe, and from him to the demandant, were duly recorded on April 26, 1869; and that, by deed dated February 27, 1882, and recorded on March 23, 1882, Snow conveyed the demanded premises to the tenant, by warranty deed, and the demandant joined in the deed, releasing in the usual form her dower and homestead interest therein, but did not, except by her release of dower and homestead, become a party to the deed.

The demandant put in evidence her title from Benjamin Snow, and rested.

The tenant called Munroe as a witness, who testified, in substance, that, two or three days before the date of the conveyances to and from him, the demandant came to his house, he being a near neighbor, and requested him to come to her house that evening, and told him that her husband was negotiating for the purchase of a patent, and was going to buy such patent; that she wanted Munroe to come and break up the trade; that he went to Snow's house that evening, and Snow met him at the door, saying that Munroe was just the man he wanted to see; that Snow said, " I am going to buy a patent of this gentleman, and you can be talking it over with him"; that afterwards the man who was to sell the patent came to Snow's house; that Munroe asked the man if he had the patent he was going to sell to Snow; that he said he had not; that Munroe suggested that Snow ought not to buy the patent without having an examination of the title, to know if he was going to get anything for his money; that the man seemed disturbed by the suggestion; that not a great deal more was said, and no further transaction of business took place that evening; that two or three days after this Snow came to Munroe and asked him if he would be willing to act as a negotiator between himself and his wife, saying, " The man who had the patent threatens me, and is going to claim heavy damages"; that the demandant

was not present at any of these conversations; that Munroe told Snow that he would do so; and that they went to a lawyer's office, who made the deeds, and they were executed there, no consideration being paid.

There was no evidence that this man referred to ever appeared again, or that he ever asserted any claim against Snow, except as stated in the testimony of Munroe.

There was evidence that Snow, with his family, continued to live on the homestead from the time of the conveyance to his wife up to and subsequently to 1882, exercising the same apparent control of the property as before the conveyance; that the taxes on the estate were assessed to and paid by him during all that time; and that, after the conveyance of the demanded premises to the tenant, he continued to live on the residue of the homestead estate up to the time he went into insolvency, in 1886, a short time prior to which he had become insane and was committed to an asylum.

It appeared that Snow was, at the time of the conveyance to his wife and long afterwards, possessed of a large amount of property, of an assessed value in excess of $150,000. The only other evidence bearing upon the question of Snow's financial condition being the statement of the demandant, that, at the time of the conveyance to her, he did not owe a dollar.

The tenant testified that he took possession of the demanded premises in the spring of 1882, soon after he got his deed from Snow; that he did not make, or ask to have made, any examination of the title, before he took the deed; that after the spring of 1882 he cut the grass on the demanded premises, and picked the apples thereon, or gave them away to others to pick, for the next two years, and thereafter, up to the time of the bringing of this action, he held possession of the estate and paid the taxes thereon; that, when he took possession, there were stone monuments at the back corner of the lot; that the rear line of the lot was about one hundred feet from the house of the demandant; that he never erected any fences or boundaries upon the demanded premises, but that, in September, 1884, he built a cellar on the lot, the wall being a heavy cemented wall, which was several feet high near Blossom Street, where the land was higher, and eighteen inches above the ground at the rear;

that trenches were dug for this wall, and the excavated material was graded upon the lot; that this cellar wall, at the rear, was within about one hundred and twenty-four feet of the demandant's house; that he cut and removed the apple trees from the premises before he dug the trenches for the cellar walls; that the work of finishing the cellar was completed in November, 1884; and that he covered the cellar walls with boards to protect them from the weather, but had not proceeded to build because he had not the money.

On cross-examination, upon being asked why he did not build, he replied that Snow, the demandant not being present, met him in the street and said his wife was anxious to see what kind of a house was going to be built there; and that he was trying to build a house to please them, and laid out a cellar for a house which would cost $15,000, but found he was not able to complete it.

There was a grant in the deed from Snow to the tenant of the demanded premises, in the following terms: " together with the right to enter the sewer pipe that the said Benjamin Snow hereby agrees to lay from the rear part of the tract of land hereby conveyed to Green Street, the said sewer pipe to be of sufficient capacity to accommodate the granted premises." There was evidence tending to show that, during the year 1882, a sewer pipe was laid by Snow from the rear of the lot to Green Street, the pipe passing within twenty feet of the demandant's house.

The evidence tended to show that the cellar and wall and the whole of the demanded premises were in sight from the house of the demandant, and not separated by any fence; that the view was not obstructed, except that some apple trees obscured the view from the lower story.

The tenant testified that he first learned that the demandant claimed to own the premises in 1889 or 1890; that he then went to see her about it; that she said a big lump came up in her throat whenever she met him; that he asked her why she did not tell him the land was hers when he put in the cellar, and she replied that she did not dare to; that he asked her who would pay the taxes for that year, and she replied that she would; that he went to see her again with his father; that his

father said to her, " When you signed that deed, you signed it in good faith, did n't you? " that she replied, " I don't know anything about faith, land is land " ; that his father said to her, " Can you put your hand into his pocket and take all he has earned for years? " and she replied, " Yes, I can if it's mine, and I don't want you to come here and talk that way to me, you can go and talk that where it belongs " ; that the tenant said to her, " I don't see why you should let me come in and cut down those trees and build that cellar " ; that she replied, " I thought that if you wanted to build on my land I had no objection " ; that he went to see her again alone, and said to her that he did not see why she did not let him know that was her land and not his, when it would not have cost her a cent, and she said she feared her husband ; that he went to see her again ; that, after some talk, the demandant said, " I don't doubt but what I said that " ; and that he asked her, " What? " and she replied, " That we will see what they will build there."

Owen B. Hutchins, the tenant's father, was called as a witness by the tenant, and corroborated the tenant as to the conversation with the demandant when he was present.

The demandant denied that the several conversations between her and the tenant and his father were materially as testified by them ; and further testified, that she lived on the homestead estate all the time in 1882, and afterwards, except that in 1882 and afterwards she and her husband resided in Lunenburg, about four miles distant, going there in the early summer and returning in the fall, generally in November ; that during the summer she occasionally visited the homestead ; that in December, 1884, she went to New Zealand, and was gone six months ; that she had returned to the homestead from Lunenburg before she started for New Zealand ; that she saw the cellar wall soon after it was built, but did not see it while being built, and never saw the tenant on the premises ; that she never made any inquiries about the cellar or wall, except at one time, she could not tell when ; that she had inquired about it of a man employed on the homestead ; that the signature appended to the deed from Benjamin Snow to the tenant was hers, but she had no recollection whatever of the signing, or the circumstances attending it ; that she received no consideration therefor ; that

she did not know that she had signed any deed relating to the homestead, or that her husband had made any deed relating thereto; that about the time of the execution of this deed her husband was bringing her deeds by the dozen for her to release dower; and that she did not know that the tenant claimed the premises until one Holman, the assignee of Snow, told her of it, in 1889.

It appeared that the demandant was a lady of superior education.

It further appeared that, in exchange for the demanded premises, Owen B. Hutchins conveyed to Snow a farm, the tenant paying Hutchins therefor; and that soon after Snow conveyed away the farm, and the demandant joined, by release of dower and homestead, in the usual form. She testified that she had no recollection of signing such release, and never received any consideration for such release; that she did not know anything about the exchange, nor that her husband had title to any farm or other property by such exchange.

It also appeared that Snow died in an insane asylum in the year 1891.

The judge ruled, at the request of the demandant, that there was no evidence to sustain any of the defences; and ordered a verdict for the demandant, the value of the improvements being agreed upon and awarded to the tenant in the verdict. The tenant alleged exceptions.

*F. P. Goulding*, for the tenant.

*H. Parker*, for the demandant.

ALLEN, J. Upon the question of equitable estoppel, we think the tenant had evidence entitling him to go to the jury. The evidence would have warranted the jury in finding that the demandant signed her husband's deed to the tenant, knowing that it purported to convey a good title to the lot; that her husband took from the tenant in exchange a farm, which he soon after sold and conveyed, she signing the deed in release of dower and homestead, and knowing all the particulars of the transaction; that she was aware that the tenant soon after getting his deed took possession of the lot and occupied it as his own, cutting grass, picking apples, cutting down apple trees, paying taxes, building a cellar wall, and doing other work in prepara-

tion for building a house; and that she, although living close by, gave no intimation to him that she claimed to own the land. It is true that she denied knowledge of these facts, and indeed went so far as to testify that, until 1889, which was seven years after the tenant had received his deed and taken possession of the premises, she did not know that he claimed the same. There was, however, other evidence, including evidence of declarations by her, tending to show her knowledge, and a jury might even draw an unfavorable inference from the very strength and extent of her denial, in view of the other testimony in the case. Her joining in her husband's deed to the tenant might put him off his guard. This was a positive act by her, which might be found to have misled him. There was evidence tending to show that the tenant supposed the land to be his own, and that she knew that he did. The whole evidence would have warranted a finding by the jury that she was estopped to claim the land as against the tenant by the circumstances attending the original purchase, and the subsequent expenditure of money upon it, and by reason of her having kept silence as to her own title when it was her duty to speak. *Tracy* v. *Lincoln*, 145 Mass. 357. *Fowler* v. *Parsons*, 143 Mass. 401, 408. *Tufts* v. *Tapley*, 129 Mass. 380. *Parker* v. *Barker*, 2 Met. 423, 431. *Gray* v. *Bartlett*, 20 Pick. 186, 193. *Kirk* v. *Hamilton*, 102 U. S. 68, 77, 79. *Dickerson* v. *Colgrove*, 100 U. S. 578. *Ramsden* v. *Dyson*, L. R. 1 H. L. 129, 140, 141. *Plimmer* v. *Mayor, &c. of Wellington*, 9 App. Cas. 699, 710. *Proctor* v. *Bennis*, 36 Ch. D. 740, 760. *McManus* v. *Cooke*, 35 Ch. D. 681, 695, 696. 1 Story, Eq. Jur. § 385.

Upon the question of fraudulent conveyance the evidence is meagre as to the probable or possible amount of the claim against the demandant's husband, the value of the homestead conveyed through Munroe to the demandant, and the amount of other property held by her husband which was open to attachment, and upon another trial the evidence may be more full, and we express no opinion upon that question as the evidence now stands.

*Exceptions sustained.*