HARLOW *v.* JASEPH.

1. CONTRACTS — RESCISSION — EXCHANGE — MISTAKE—MEETING OF MINDS.

> One of the parties to an exchange, who executed a bill of sale as a part of the transaction, containing a clause whereby he assumed a lease, but did not intend to agree to any such provision and did not receive a copy of the bill of sale, but afterwards corrected a mistake, or incorrect description in one of the other papers constituting a part of the transaction at the request of the other party, also selling the property soon after, so that he could not place the plaintiff in *statu quo*, affirmed or ratified the alleged error in his bill of sale and became liable to the plaintiff in an action of assumpsit for the rent which plaintiff was compelled to pay on the lease.

2. PRINCIPAL AND AGENT—RATIFICATION.

    The principal may ratify the unauthorized act of his agent, in writing into an instrument a clause that he was not authorized to insert.

3. SAME—TRIAL—DIRECTED VERDICT.

    Although the questions involved in these respective claims of plaintiff and defendant are generally held to be mixed questions of law and fact, the trial court did not err in directing a verdict for the plaintiff on the theory that only one inference could be drawn from the facts.

Error to Kalamazoo; Stewart, J. Submitted October 13, 1914. (Docket No. 92.) Decided December 19, 1914.

Assumpsit by William O. Harlow against Edwin Jaseph on a covenant to assume a lease. Judgment for plaintiff on a directed verdict. Defendant brings error. Affirmed.

*E. M. Irish,* for appellant.

*Jackson & Fitzgerald,* for appellee.

STONE, J. This is an action of assumpsit brought to recover of defendant the amount of rent of a certain store building containing a stock of goods sold by plaintiff to defendant, which rent the plaintiff claims defendant had agreed to assume and pay, and save harmless the said plaintiff on his covenant to pay rent in a certain lease. Defendant having refused to pay such rent, the same was paid by the plaintiff, who brings this action to recover the amount so paid. The history of the dealings of the parties was as follows:

On January 15, 1913, the plaintiff owned and possessed a stock of sporting goods contained in a store located at 122 West Main street, Kalamazoo. He held the premises under a written lease from the Home Savings Bank of that city. The said bank

held the store under another lease from Anna E. and John B. Doyle. The lease from the bank to the plaintiff contained the following clause:

"This lease is made subject to the Home Savings Bank lease of said property, a copy of which is hereto attached."

The lease from the Doyles to the bank contained the following clause:

"And it is agreed by the parties hereto that said second party will not assign or transfer this lease or sublet said premises or any part thereof, without the written assent of said party of the first part, except for office or desk room."

There was a written consent by the Doyles to the sublease from the bank to the plaintiff. Neither the Doyles nor the bank ever signed a consent for the defendant to occupy the store. The defendant owned a farm of 160 acres, 20 acres of it, however, was a wood lot, and did not adjoin the other property, but was a considerable distance therefrom. After some preliminary negotiations, the parties agreed to trade the stock of goods for the 160-acre farm; the plaintiff claiming that defendant agreed to take over the lease of the store. The plaintiff was to give defendant a mortgage back of $3,200 on the farm. The defendant and his wife executed a deed of the farm to the plaintiff, and the latter executed a bill of sale of the stock of goods to the defendant, and plaintiff and his wife executed the mortgage back to the defendant. The defendant claims that the bill of sale was not read over or delivered to him. It appears that the bill of sale was left with Mr. Frost, the attorney who drew the papers for the parties, and that a copy thereof was delivered to the plaintiff. The bill of sale contained the following clause:

"Said party of the second part is to assume and save harmless the party of the first part from the covenants

of the lease entered into between himself and the Home Savings Bank.''

Attached to the plea of the general issue was a notice to the effect that the defendant would show on the trial that the above clause was inserted in said contract without the knowledge of the defendant; that he did not know it was there; that he never agreed to said clause verbally or in writing, and never intended to; and that said clause was without consideration and void, for the reason that said plaintiff never had any lease with the Home Savings Bank which he could legally transfer to defendant, and no lease or contract under which he could legally sublet the whole or any part of said store. Whether or not defendant did agree to assume the covenant of the lease, and save harmless the plaintiff, was a disputed question upon the trial. It did appear that neither the lease nor a copy thereof, from the Doyles to the bank, was attached to the plaintiff's lease, nor was the same shown to defendant. Mr. Frost prepared an assignment to defendant of the plaintiff's lease, which was signed by the latter.

Defendant took possession of the stock of goods and store on January 16, 1913, and retained possession until February 20, 1913, when he sold the stock to one Maxwell. By the terms of the bill of sale the plaintiff was to pay the rent to January 16th. The rent was $115 a month. In settling with the bank for the rent the plaintiff gave his check for $57.50, one-half month, and defendant turned it over to the bank, and settled the month's rent. Defendant claims that Mr. Frost was the agent of both parties in drawing the papers. The bill of sale, and copy of plaintiff's lease with the Home Savings Bank with the assignment thereon were left with Mr. Frost, and there was evidence that the latter, acting for the defendant, went to see the president of the bank with

reference to obtaining the bank's consent to an assignment of the lease, and that such consent was refused, unless the owners of the building would consent. The defendant was never disturbed in his possession of the store, and he paid the rent of the store up to the time of the sale to Maxwell.

Within a few days after the transaction of January 15, 1913, Mr. Frost discovered that there was a mistake in the description of the premises contained in the deed, and he immediately notified the defendant to come to his office, and he came very soon thereafter, and at that time Mr. Frost and defendant had some talk with reference to the lease, and the defendant then disclaimed any agreement to take over the lease. Mr. Frost then advised him not to sign the deed correcting the mistake. Defendant himself testified that he learned about the provision concerning the lease and what was contained in the bill of sale within a day or two after January 15th, and that Frost advised him not to sign the deed then. After he learned of this bill of sale and the provisions contained in it, and on the 14th day of February, 1913, he executed a deed to correct the description contained in the deed of January 15th, and continued in possession of the store until the 20th day of February, 1913, when he sold the stock to Maxwell, who continued to occupy the store until about the 22d of May, when the key was returned to plaintiff. Subsequent to that date plaintiff was called upon by the bank to pay the rent, which he did, and this suit was brought to recover from the defendant for the rent so paid by plaintiff. If the plaintiff is entitled to recover, there is no dispute that the amount of the verdict is correct.

The testimony of the circumstances relating to the correction of the deed is uncontradicted, and is very significant. Upon that subject Mr. Frost testified as follows:

"*Q.* Now, Mr. Frost, I want to ask you about that deed and mortgage. You said something about the description in the deed; did you afterwards discover that there was an error in the description?

"*A.* Yes, I did, Mr. Jackson, as I remember it now. After the deed had left my possession I got to thinking about the description to myself, and I thought that can't be right, there isn't 160 acres, so I came up to the register of deeds' office myself, and went and looked at the deed and found it wasn't correct, and I at once notified Mr. Jaseph and Mr. Harlow both, I think, by telephone, that I had made a mistake in the description of the deed, and then I drafted another deed with the proper description, and telephoned Mr. Jaseph to come down, he and his wife, and sign the other deed.

"*Q.* How long was it after this deed was given before you made this discovery?

"*A.* Right off. * * *

"*Q.* How long after that was it before you got the deed from Mr. Jaseph—the corrected deed—signed?

"*A.* I know Mr. Jaseph came in very soon, I know for this reason, he came in and—do you want me to tell what took place?

"*Q.* Yes.

"*A.* I said, 'Mr. Jaseph, there is a mistake in the description of the deed to Mr. Harlow,' and I said, 'Mr. Harlow looked the paper over when I read it, but it isn't right,' and I said, 'I have drafted another deed which I want you and Mrs. Jaseph to execute to make it correct.' Mr. Jaseph said, 'All right,' and then Mr. Jaseph spoke to me and he said, 'What did you say about the assignment of some lease?' And I said I had been down to see Mr. Barker of the Home Savings Bank and that he would not consent to the assignment of the lease, and Mr. Jaseph, using his language, said, 'Oh h—l, I didn't never take that lease,' then I said, being that is so, he shouldn't sign that deed; I knew there was a mistake some place, and I wanted to do what I could to rectify it.

"*Q.* Was there anything further done about the lease?

"*A.* Not about the lease, Mr. Jackson.

"*Q.* Was there anything further done about the deed?

"*A.* Yes, later on Mr. and Mrs. Jaseph came up and executed the deed to Mr. Harlow.

"*Q.* Do you recall how long that was afterwards?

"*A.* I don't, Mr. Jackson.

"*Q.* Well, now, I suppose the deed itself bears the date upon which it was executed?

"*A.* Oh, yes; I presume so.

"*Q.* With reference to the lease, you told Mr. Jaseph, did you, that Mr. Barker said he went to see the owners of the property—

"*A.* No, not that way, Mr. Jackson; I told him Mr. Barker told me that I would have to see the owners of the property.

"*Q.* Did you ever try to see the owners of the property?

"*A.* I did not."

The defendant, after testifying on direct examination that he never agreed to assume the lease, but that the next day he went back to Mr. Frost who said to him, "I can't get that lease assigned over to you, I have been over to the Home Savings Bank," and that defendant said in reply, "I don't want it, and I never agreed to take it," on cross-examination testified as follows:

"*Q.* When was the first time, then, that you learned that Mr. Harlow claimed that you had taken over this lease to the store?

"*A.* When I went down to see Mr. Frost the next day or so.

"*Q.* Within a day or two, anyhow?

"*A.* Yes, sir.

"*Q.* You then learned that Mr. Harlow claimed you had taken the lease to the store when you had purchased the stuff?

"*A.* Mr. Frost spoke about the lease; I said, 'What lease?' He said, 'Why, the lease of that store.' I said, 'I don't want the lease of that store. I didn't agree to take any lease.'

"*Q.* Mr. Frost told you then that Mr. Harlow claimed you did and told you not to sign the deed then—the corrected deed?

"*A.* He said, 'Let it rest until we get it settled.'"

"*Q*. And you understood Mr. Harlow claimed that you had taken over the lease of the store when you bought the stuff?

"*A*. Yes, he claimed that.

"*Q*. You understood from Mr. Frost on that day— a day or two afterwards—later when you went back there to see Mr. Frost, when you and Mr. Frost had this conversation, that Mr. Harlow then claimed that you had taken the lease of the store with the goods?

"*A*. That is what he told Mr. Frost. It was something new to me.

"*Q*. But you understood that day that was what Mr. Harlow claimed?

"*A*. Yes, that is what Frost told me Harlow claimed. He told me Harlow ordered him to draw up a lease and bill of sale, and he done it, and tried to get it transferred to me and they wouldn't do it. I said I never agreed to take the lease—

"*Q*. You learned that a day or two after the transaction was made?

"*A*. Yes, sir; I did.

"*Q*. And you have understood up to the present time that when you bought those goods you assumed the lease?

"*A*. I understood he has claimed I did, yes.

"*Q*. And you were in possession of the store at that time, were you not?

"*A*. Yes, sir.

"*Q*. At the time when you learned this of Mr. Frost?

"*A*. Yes.  *  *  *

"*Q*. And you knew about this provision which was inserted in this bill of sale, you learned that from Mr. Frost a day or two after the original transaction, as I understand it; is that correct?

"*A*. Yes, sir.

"*Q*. And following that you gave another deed to Mr. Harlow, didn't you?

"*A*. Yes, sir; we rectified the description in the other one.

"*Q*. To rectify the mistake that was made in the original transaction?

"*A*. Yes, sir. (The deeds were then shown witness, the first bearing date January 15th, and the second, or corrected deed, February 14th.)

"*Q*. Mr. Jaseph, I notice that nearly a month ex-

pired between the time that you gave this original deed and the time that this corrected deed was made from January 15th to February 14th. Let me ask you if during that time you didn't state to Mr. Frost that you wouldn't give Mr. Harlow a corrected deed unless he would release you from that clause in the bill of sale, or that in substance?

"*A.* No, sir; he advised me to wait."

At the close of the plaintiff's testimony defendant's counsel moved for a directed verdict because it was out of the power of the plaintiff to transfer the lease without the consent of the owner of the premises, and that there was a failure of consideration. The court refused to direct a verdict for the defendant, adding:

"Under the proposition of the lease, if Mr. Harlow kept his lease, as the bill of sale is drawn, Mr. Jaseph would be obliged to take care of it. (To which ruling defendant's counsel excepted.)"

The trial court instructed the jury that whatever the prior arrangement was as understood by the defendant, when on the 14th of February he corrected the deed, he acquiesced in and affirmed the entire transaction of January 15th, to save harmless the plaintiff from the payment of rent under the lease between the plaintiff and the bank, and was estopped from denying his obligation under the bill of sale as written. A verdict and judgment were rendered for the plaintiff for the full amount of the claim, and the defendant has brought the case here upon writ of error.

Many errors are assigned which, in our view of the case, we do not think it necessary to discuss, for the reason that, if the trial court was right in its instruction to the jury, the plaintiff was entitled to recover, and the errors assigned on the several rulings of the court complained of, at most, would be harmless error.

It is the claim of the plaintiff that he was entitled to recover, and to have a verdict directed in his favor upon the undisputed testimony of the plaintiff and the testimony of defendant. It is urged by plaintiff's counsel that, if defendant's testimony is true *in toto,* then the most that can be claimed for it is that the minds of the parties never met upon an exchange of their properties; for there is no mistaking the fact that, under the evidence in the case, the plaintiff never intended to exchange his stock of goods for this farm except upon the terms contained in the bill of sale; and, assuming defendant's testimony to be true, he never intended to assume the plaintiff's liability under the lease. In such an event there was no meeting of the minds; but according to the testimony of Mr. Frost, which is uncontradicted, he discovered a mistake in the description contained in the deed given by the defendant, and immediately notified the defendant, who came to his office within a day or two after the transaction of January 15th, where the defendant learned of the provision contained in the bill of sale executed by the plaintiff, and thereafter, without attempting to rescind the transaction but with full knowledge of the plaintiff's contention concerning the lease and the provision contained in the bill of sale, and a month after this original transaction, executed a deed correcting the description. He thereby confirmed the transaction; and within a few days thereafter, and on the 20th day of February, he sold this stock of goods to one Maxwell, thereby putting it beyond his power to rescind the transaction. In other words, it is claimed by the plaintiff that under these conceded circumstances the defendant ratified the original transaction as claimed by plaintiff, and therefore the plaintiff is entitled to recover. We think there is much force in this claim. In support of this position plaintiff cites the following cases:

*Estey Organ Co.* v. *Lehman*, 132 Wis. 144 (111 N. W. 1907, 11 L. R. A. [N. S.] 254, and note, 122 Am. St. Rep. 951), holding that the purchaser of a chattel who, without any agreement between the parties as to the price, receives it from the carrier and retains it, with knowledge of the price demanded by the seller which was a reasonable one, will be bound to pay that price, although, before receiving the property, he contended that the price to be paid was a less amount. *Cunningham* v. *Rotograph Co.*, 30 App. D. C. 524 (15 L. R. A. [N. S.] 368, 13 Am. & Eng. Ann. Cas. 1147).

If the writing of the clause complained of by the defendant, in the bill of sale, was the unauthorized act of Mr. Frost, the agent of defendant, the latter certainly could ratify that act. The entire contract concerning the trade was an indivisible one, and when defendant voluntarily corrected the deed and, instead of rescinding the trade, held the goods, knowing at the time that plaintiff claimed that the defendant assumed the lease and was to save the plaintiff harmless from the covenants thereof, we think it should be held that defendant ratified the terms of the sale as they were written.

In *Busch* v. *Wilcox*, 82 Mich. 315 (46 N. W. 940), this court held that when a person adopts the unauthorized acts of another in his behalf, and has received and holds the benefits accruing therefrom, he adopts and ratifies the instrumentalities by which the fruits were obtained. See, also, *Sokup* v. *Letellier*, 123 Mich. 640 (82 N. W. 523); *Schmid* v. *Village of Frankfort*, 141 Mich. 291 (104 N. W. 668).

There is another view of the case which is equally binding upon the defendant. When the plaintiff learned that defendant claimed that he never agreed to take over the lease, and save the plaintiff harmless from the covenants thereof, he might well have said:

"As the minds of the parties have not met, I will rescind the entire contract."

By the conduct of the defendant in correcting the mistake in the deed, and within five days thereafter selling and delivering the stock of goods to Maxwell, he put it out of his power to place the plaintiff *in statu quo* had the latter desired to rescind the sale.

We think there is much force in the position of the circuit judge that the defendant was estopped by his conduct from claiming that he did not ratify the entire transaction. It is true the rule is well settled that no estoppel is created when the situation of the party in whose favor the estoppel is claimed to operate is no different from what it otherwise would have been. But here it seems to us that the situation of the plaintiff was changed, as we have above indicated, by the conduct of the defendant. If defendant's claim that he never agreed to take and assume the lease is true, it would have been a good defense to a bill filed by plaintiff to correct the description in the deed and reform that instrument; for if the general equities of the whole transaction were against complainant he could not have reformation. 34 Cyc. p. 945; *Redding* v. *Rozell*, 59 Mich. 476 (26 N. W. 677).

By his voluntary correction of the description it may be said that defendant impliedly waived his right to claim that the entire contract as asserted by the plaintiff was not correct.

While these questions are generally held to be mixed questions of law and fact, yet, when but one inference can be drawn from the conceded facts, it is not error for the court to charge the jury as to the legal effect of such acts.

We are of opinion that, under the conceded facts as we have reviewed them, the plaintiff was entitled

to ·recover in this action, in any view which we are able to take of the case.

The judgment of the circuit court is therefore affirmed.

MCALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.