WESTERN MARYLAND RY. CO. v. EASTERN CEMENT GUN CO.

(Circuit Court of Appeals, Fourth Circuit. February 11, 1916.)

No. 1399.

CONTRACTS ⬦⟳353(8)—ACTION FOR BREACH—INSTRUCTIONS.

Plaintiff contracted to do certain work for defendant railroad company in the construction of a roundhouse, to be completed within 55 working days; the contract plainly providing that defendant's chief engineer should be its sole representative with respect to the work, with power to declare the contract forfeited in case of default, and his decision to be conclusive in any dispute arising. Plaintiff was slow in commencing, and after a very small part had been done discontinued the work in December until spring, with the consent as claimed, of defendant's engineer in charge, but without the consent of or notice to the chief engineer. When plaintiff was again ready to commence, 87 days after the contract was made, the roundhouse had been otherwise completed and was in use, and permission was refused. *Held*, in an action to recover damages, that an instruction was erroneous which permitted plaintiff to recover if the jury should find that defendant's engineer failed to notify it promptly after it quit work that it was in default, and that if it had been so notified it could have completed the work within the 55 days, since, the terms of the contract being explicit, no such notice was required, and defendant could not be estopped by failure to notify the plaintiff of a fact which it was presumed to know.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1837–1840; Dec. Dig. ⬦⟳353(8).]

Woods, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Action at Law by the Eastern Cement Gun Company against the Western Maryland Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

George R. Gaither, of Baltimore, Md., for plaintiff in error.

Francis J. Carey and James Piper, both of Baltimore, Md. (Carey, Piper & Hall, of Baltimore, Md., on the brief), for defendant in error.

Before KNAPP and WOODS, Circuit Judges, and DAYTON, District Judge.

DAYTON, District Judge. This controversy springs from a contract dated October 25, 1912, whereby the Cement Company contracted to perform certain cement or "gunite" work by use of a patented device known as the "Cement Gun" upon the stalls of the railway's roundhouse then in course of construction at Hagerstown, Md.

It is clearly shown and admitted that the contract was a "rush" one. The cement company undertook to start the work within 2 days and complete it within 55 working days, or the equivalent thereof in working time, "from the day that at least three stalls of steel or the equivalent thereof should be in place." Further, to insure the prompt completion of the work, the contract provided that the Cement Company should "place at least four cement guns, with the necessary machinery

and labor to operate the same, on the work at once, and to maintain this outfit, or more, if necessary, to complete the work within the time limit of 55 working days." Pratt, the railway's chief engineer, was by the terms of this contract constituted the sole executive representative of the railway company, his decision was to be final and conclusive in any dispute arising, and he was empowered under broadest terms, if in his opinion the work was not efficiently prosecuted, either to take charge of it and with the Cement Company's tools and machinery complete it, charging over to the Cement Company the cost of doing so, or to declare the contract, for any failure or omission, forfeited, in which latter event the Railway Company was to be exonerated from any and all liability for work done. He was also empowered, if deemed expedient or necessary, to stop the work, or any portion of it, or diminish the force engaged upon it without claim for damage by reason of so doing.

A careful analysis of the evidence adduced on trial clearly demonstrates that the Cement Company was wholly unprepared to meet the requirements of such a contract as this. Instead of being able to start within two days and "to place at least four cement guns with the necessary machinery and labor to operate same on the work at once," it is admitted that it took it from October 25th to November 18th, 24 days, to collect together its apparatus and get it upon the ground, and it was not until December 3d, 15 days thereafter, that it had all its scaffolding erected, had placed chicken wire over roof members, and had in its machinery and some sand, although three stalls of steel were in place on November 18th. The work dragged along until December 18th, when Pierce, the Cement Company's manager in charge, "in the interest of his company," shut it down, until spring should bring better weather conditions. He instructed his foreman to remove and pack all equipment and to lay off all men, and proceeded to look out for work elsewhere. At this time the Cement Company had material in the nature of wire, lumber, and piping, and one carload of sand on the ground. Up to then all the cement it had used had been borrowed from the Railway Company, and it had only cemented a portion of one beam covering a surface of a few square yards. This shut-down until spring, the Cement Company claims, was effected by Pierce after he had discussed the matter with McCausland, the railway's engineer in charge, who expressed his thought that "it would be best for all concerned to do so." McCausland denies this, but in our view of the case it becomes immaterial whether he did or not. The contract was too plain in its terms for any one to be misled. As we have said, Pratt, chief engineer, was the sole representative of the company with whom any modifications of it could be made or any such shut-down could be agreed upon. The court below very properly so ruled, and instructed the jury that McCausland had no authority to allow the stoppage of the work. Jordan, general manager, and Warner, president, of the Cement Company, however, as disclosed by the correspondence introduced in evidence, assumed the contrary, and on December 20th, two days after, Jordan wrote Pratt asking an advancement upon the contract price as a matter of favor, not of

right. On January 17th following he wrote a letter to McCausland, asking his assistance in securing this advance, and on the same day one to Pratt inclosing a photograph of cement gun work at the West Philadelphia station of the Pennsylvania Railroad as illustrating the character and possibilities of "gunite" work, and suggesting:

"If this weather continues to hold, it is very possible that we will go down to Hagerstown again and possibly start some sort of operation, provided it meets the approval of Mr. McCausland."

He further states he—

"expects to go to Hagerstown some time in the near future for the purpose of taking over a new general superintendent of construction work, who is a thorough civil engineer with 10 or 12 years' practical experience."

On January 20th, he both telegraphed and wrote McCausland that he "would like very much to proceed with work, stall at a time," that the weather was favorable, his operating men were idle, and a "cracker jack new superintendent" was available. In his letter he believes the weather conditions will continue favorable enough to enable him to make considerable showing on the work, and "if it would not interfere with the movements of locomotives in the roundhouse" he feels sure he could "finish several stalls before the real spring work opens and we put a number of guns to work." It is to be borne in mind that during this period of 87 days since the contract (to be executed in 55 days) had been signed, this roundhouse had been so far completed as to be fit for use and was being used; that its use was claimed to be worth $18,000 a month to the railway company; that it was full of locomotives, and that such locomotives could not be housed in it while the cement work was being done, for the reason that its dust would get into the locomotive bearings and greatly injure them; that the sum total contract price for this cement work was only $12,700, and that cementing the steel stalls by this "gunite" process was largely an experiment, not at all necessary, other than as a preservative of the steel work, which could otherwise be secured by acid paint. Jordan's proposition to go down "and start some sort of operation" very naturally was turned down at this time and under these conditions. This led to a personal interview and further correspondence between Jordan and McCausland, and then Warner, president of the Cement Company, took it up with the only man, Pratt, authorized to settle the matter. In his first letter of February 10th he expresses his surprise that his company is to be "eliminated" from coating the roundhouse with an entirely inadequate allowance for preliminary expenses made in the fall and winter preceding *before we were ordered to shut down.*" In his letter of March 20th he expresses it as a "mutual *agreement to discontinue.*" Pratt may have regarded these expressions as somewhat disingenuous, in view of the fact that he had never been in any way consulted by any one about the shut-down and knew nothing of it until after its complete accomplishment by the Cement Company's manager in charge. The upshot of the matter was that on April 13th he informed Warner that the work was not stopped on instructions from the Railway Company, but by his manager, Pierce, who was

handling matters in a very unsatisfactory manner, and therefore the company did not consider itself liable for any claim on account of the work. Thereupon this suit was instituted.

As a matter of law, if upon the trial the defendant had asked for a peremptory instruction directing a verdict for itself, we are clearly of the opinion that it should have been given, because this evidence was wholly insufficient to warrant a verdict for the plaintiff. But no such instruction was asked. The plaintiff however did ask, and the court gave the jury, an instruction to the effect that if they found from the evidence that the plaintiff Cement Company "believed in good faith that it had the consent of the defendant to suspend work," and "that the chief engineer of defendant knew that the plaintiff so believed," and "did not notify the plaintiff promptly that it was in default under the contract and that it would treat the contract as forfeited," and if they should further find "that the work required to be done by the plaintiff could have been completed by it within 55 working days from the time when three stalls of steel, or the equivalent thereof, were in place on the work, had the plaintiff been so notified," they should find for the plaintiff. This instruction is designated in the record as "plaintiff's fourth prayer." The court further refused defendant two instructions, designated as defendant's first and second "prayers," which under the evidence were unobjectionable and should have been given.

This fourth instruction given for plaintiff was erroneous for at least these reasons: First, because it was not warranted by the evidence. It cannot be seriously contended that the stoppage of work on December 18th by the Cement Company was not a violation and abandonment of the contract, if it was done of its own will and without authority and consent of the Railway Company. It cannot be contended that the Cement Company could, under the terms of the contract, obtain this authority and consent from any one other than Pratt; that the statement of McCausland, if made, "that it would be best for all concerned to stop," could and did give no such authority or consent on the part of Pratt; or that Pratt at the time of the stoppage knew or had any reason to know of any such expression of opinion by his subengineer. It is not contended for an instant that his subordinate's judgment or opinion in this regard was submitted to Pratt for his approval. How, then, could the plaintiff in a legal sense "believe in good faith that it had the consent of the defendant to suspend work"? If it had no such consent, and no ground to believe in good faith it had, how could Pratt know that it so believed? Suppose he might have conjectured that the plaintiff was blindly misinterpreting the terms of the contract, what reasonable ground had he for so doing? Was it reasonable for him to assume or conjecture that plaintiff's officers were not competent to interpret the plain terms of the contract expressed in simple English language? If it was not reasonable for him to do so, how could the jury be permitted to conjecture that he did so conjecture and from such conjecture arrive at knowledge that it was so? In Midland Valley R. Co. v. Fulgham, 104 C. C. A. 151, 181 Fed. 91, it is very pertinently said:

"Conjecture is an unsound and unjust foundation for a verdict. Juries may not legally guess the money or property of one litigant to another. Substantial evidence of the facts which constitute the cause of action * * * is indispensable to the maintenance of a verdict sustaining it."

But, second, the instruction is further erroneous in that it assumes in effect that if one executes a plain, unambiguous contract to do work, abandons it upon the advice of one not a party to it, or in any way empowered to authorize such abandonment, he nevertheless can recover damages from the party whom he has injured by such act of his unless the other promptly notifies him that he is in default. In other words, the injured party to a broken contract is estopped from denying recovery of damages from him by the party breaking the contract unless he promptly notifies the latter of his wrongdoing.

We can find no justification for this proposition under the law of estoppel. That law holds an innocent person, under various circumstances and conditions, protected from injury when he has been misled to his injury by another who was inert and silent when, morally and in good conscience, he should have been active and outspoken, or who was active and outspoken where he should have been inert and silent. This law is for the benefit of the innocent party deceived and misled. It cannot be invoked under any conditions by a wrongdoer to secure gain by way of damages, profits, or otherwise from the person he has wronged.

It follows that the judgment must be reversed and the case remanded, with directions to the court below to set aside the verdict and award a new trial.

Reversed.

WOODS, Circuit Judge (dissenting). In this case there was a conflict of evidence. The majority of the court are of opinion that the conflict is immaterial, and that in no view of the facts was there any issue for the jury. To this conclusion I am unable to assent. The Eastern Cement Gun Company made a contract on October 25, 1912, with the Western Maryland Railway Company to cover with gunite, a cement preparation, certain exposed steel work on its new roundhouse under construction at Hagerstown, Md. The work was to be begun within 2 days and completed within 55 working days. The contract provided:

"For the failure to prosecute the work with an adequate force for non-compliance with his instructions in regard to the manner of executing the work, or for any other omission or neglect of the requirements of this agreement and specifications on the party of the first part, the said chief engineer may, at his discretion, declare this contract, or any portion or section embraced therein, forfeited, which declaration and forfeiture shall exonerate the said Railway Company from any and all obligations and liabilities arising under the contract the same as if this agreement had never been made; and the reserve percentage of 10 per cent. upon any work done by the party of the first part may be retained forever by the Railway Company. It is mutually agreed and understood that the decision of the chief engineer shall be final and conclusive in any dispute which may arise between the parties of the agreement relative to or touching the same."

The agreement also contained these provisions:

"If it shall be necessary or expedient to stop the work, or any portion of it, or that the forces employed thereon should be diminished, the party of the second part shall have the right and power to stop said work, diminish said force, and the party of the first part shall have no claim for damage by reason thereof. But the time herein specified for the completion of the work shall be extended for a period equal to that during which the work is suspended."

This action is for damages for repudiation of the contract and preventing the plaintiff, the Cement Company, from completing the work. The Cement Company began work, but found it was operating to its disadvantage because of the difficulty of keeping out of the way of contractors for other portions of the work, and the cold weather which prevented the placing of cement by the plaintiff's process. Under these conditions, according to the evidence on behalf of plaintiff, Mc-Causland, the assistant engineer of the railway company, in immediate charge of the work at the roundhouse, agreed with the plaintiff on December 18, 1912, that it would be better to stop temporarily and resume work in the spring. Pierce, the manager in charge of the cement work, testified that at the time plaintiff was ready, able, and willing to complete the work and could have done so within the time required by the contract. Jordan, who became manager of the work in the latter part of the year 1912, testified that the company was ready, able, and willing to do the work in the spring; and Warner, the president, testified that in March he gave notice to Pratt, the chief engineer of the Railway Company, of his readiness to proceed. McCausland denied that he agreed for the work to be stopped and resumed in the spring, and he and Pratt testified that its progress was very unsatisfactory. It was not disputed, however, that McCausland notified Pratt that the Cement Company had stopped work with the intention to resume in the spring, and that Pratt made no objection nor protest. He explained his failure to object or protest at the time by saying that he supposed the Cement Company had already stopped and thereby broken the contract. He did not declare the contract forfeited until March, 1913. There was testimony from both sides to the effect that it would have been almost impossible for the Railway Company to use the roundhouse for its engines, had they allowed the Cement Company to continue its work in the spring. On December 20, 1912, the general manager of the Cement Company wrote to Pratt, setting forth the situation, indicating the company's intention to complete the work later, and asking for financial assistance. Afterwards other letters of the same purport were written by officers of the Cement Company to Pratt, as well as McCausland. The correspondence with McCausland admitted of the inference that he did not regard the contract relations of plaintiff and defendant ended by the suspension of the work. Pratt made no response to letters sent him on the subject of later completion of the work or allowance of compensation for the labor and expenses incurred, until February 19, 1913, when he wrote:

"Absence from the office and pressure of other matters has prevented my being able to make earlier acknowledgment of your of the 10th inst. I hope

231 F.—40

to be able to communicate with you at an early date, setting a time for a conference on the matter referred to in your letter."

On April 14, 1913, he wrote as follows:

"Referring to your communications of March 20th and April 7th, I have to advise that in accordance with my statement to you when you called at the office some little time ago, the work at Hagerstown was not stopped on instructions from the Railway Company, but by your manager, Mr. Pearson, who, I understand from a statement of your representative, was handling matters in a very unsatisfactory manner. The Railway Company does not consider that you have any claim in connection with the Hagerstown work, but we are willing to discuss with you your actual expenditures at that point."

This statement is sufficient, without further narrative, to make clear the issues made by the testimony. The District Judge instructed the jury on behalf of the defendant that McCausland, the assistant engineer, could not bind the Railway Company by consent to the suspension of work with the understanding that it was to be resumed in the spring. He refused instructions tendered by the defendant, which under the evidence would have required a verdict for the defendant, and gave at the request of the plaintiff the following instruction as the issue on which the verdict should depend:

"The plaintiff prays the court to instruct the jury that if they find from the evidence that plaintiff believed in good faith that it had the consent of the defendant to suspend the work on the Hagerstown roundhouse until the following spring, and that the chief engineer of the defendant knew that the plaintiff so believed, and shall further find that the defendant did not notify the plaintiff promptly that it was in default under the contract and that it would treat the contract as forfeited, and if the jury further find that the work required to be done by the plaintiff could have been completed by it within 55 working days from the time when three stalls of steel or the equivalent thereof were in place on the work, had the plaintiff been so promptly notified, then their verdict shall be for the plaintiff."

Under these instructions the jury found a verdict for the plaintiff. Whether action or nonaction or mere silence will operate as estoppel depends upon the facts of each case, under the application of some general principles by which they are to be tested. Here reliance is placed upon the silence of the chief engineer of the Railway Company when he was informed of the purpose of the Cement Company to suspend work temporarily and resume and complete the work in the spring. For the silence of the chief engineer to be available as estoppel, the Cement Company was under the burden of showing: (1) Such relationship between the parties as imposed the duty upon the chief engineer to speak to prevent loss; (2) the misleading of the plaintiff to its damage by the silence of the chief engineer; (3) the expectation chargeable to the chief engineer that the plaintiff would probably be misled by his silence; (4) facts indicating that a different course of conduct would have been taken and the loss averted but for the silence of the chief engineer. Wiser v. Lawler, 189 U. S. 260, 23 Sup. Ct. 624, 47 L. Ed. 802; Brinckerhoff v. Lansing, 4 Johns. Ch. (N. Y.) 64, 8 Am. Dec. 538; Bank v. Lee, 13 Pet. 107, 10 L. Ed. 81; Carmine v. Bowen, 104 Md. 204, 64 Atl. 934, 9 Ann. Cas. 1135; Eareckson v. Rogers, 112 Md. 160, 75 Atl. 513; Carroll v. Manganese Co., 111 Md. 252, 73 Atl. 665.

The Supreme Court of Maryland thus states the principle in Carmine v. Bowen, supra:

"Where a person with actual or constructive knowledge of the facts induces another by his words or conduct to believe that he acquiesces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice."

In Bigelow on Estoppel, 564, it is said:

"A representation in the nature of a negative of one's rights may, as we have seen, arise from pure silence; and from pure, but misleading, silence with knowledge, or passive conduct joined with a duty to speak, an estoppel will arise."

From this statement of the evidence and the law it seems clear that these issues of fact were involved in the decision of the cause: (1) Did the assistant engineer in charge of the work consent that the work should be suspended and resumed and finished in the spring? (2) Did the chief engineer know, or should he have known from the telephone message sent him by McCausland, his assistant, from the letters to him, or from the circumstances, that the plaintiff believed McCausland to be his representative, and that as such he had authority to consent to the postponement of the completion of the work, and that he had done so? (3) Was the plaintiff misled by the silence of the chief engineer, and was it for that reason that it failed to complete the work within the time limit provided by the written contract? (4) If it was so misled, and the chief engineer did not intend to acquiesce in the postponement of the work until the spring, did justice and good conscience impose upon him the duty of notifying the plaintiff of his refusal to acquiesce in time for it to complete the work within the time limit?

As to this last question it seems important to observe that on the issue of estoppel from conduct, in a law case, it is generally for the jury to decide, not only what the facts are, but also the issue whether under the facts as found the party against whom the estoppel is set up has so misled the other party by his acts or omissions as to his legal rights, or as to his intention to assert them, that it would be unjust to allow him to avail himself of them. Maxwell v. Bay C. & B. Co., 41 Mich. 453, 2 N. W. 639; Snow v. Hutchins, 160 Mass. 111, 35 N. E. 315; Munroe v. Stanley, 220 Mass. 438, 107 N. E. 1012; Harlow v. Jaseph, 183 Mich. 500, 149 N. W. 1047; Tune v. Beeland, 131 Ga. 528, 62 S. E. 976; Columbia & C. R. R. Co. v. Laurens Cotton Mills, 82 S. C. 24, 61 S. E. 1089, 62 S. E. 1119.

There are some authorities which hold, on the contrary, that the question whether the inference of estoppel is to be drawn from ascertained facts is always a question of law for the court. Amarillo Bank v. Sanborn (Tex. Civ. App.) 169 S. W. 1075; Pittsburg C. Co. v. West Side R. R. Co., 227 Pa. 90, 75 Atl. 1029; Holt v. New England T. & T. Co., 110 Me. 10, 85 Atl. 159. We cannot doubt, however, that where reasonable men might draw different inferences from the facts proved or admitted it is for the jury to draw the inference whether

acts, omissions, declarations, or silence of one party are of such character as to influence the other party to do to his detriment what he would not otherwise have done, and whether the person charged with the acts, omissions, declarations, or silence ought in good conscience to bear the consequences. It is not easy to see why the inference of estoppel in a doubtful law case should be accepted or rejected by the court, and not the jury, any more than the like inference on the closely related questions of fraud and mistake.

On this reasoning I think the District Judge was right in rejecting the defendant's request to charge, but I think he should have added the words, or their equivalent, which we have italicized, so that the instruction would read as follows:

If the jury find from the evidence that the plaintiff believed in good faith that it had the consent of the defendant to suspend the work on the Hagerstown roundhouse until the following spring, and that the chief engineer of the defendant knew that the plaintiff so believed, and shall further find that the defendant did not notify the plaintiff promptly that it was in default under the contract and that it would treat the contract as forfeited, and if the jury further find that the work required to be done by the plaintiff could *and would* have been completed by it within 55 working days from the time when three stalls of steel, or the equivalent thereof, were in place on the work, had the plaintiff been promptly notified, *and if they find, further, that the Railway Company, or its chief engineer, ought in justice and good conscience to have informed the plaintiff that the work would not be accepted at a later date,* then their verdict shall be for the plaintiff.

I therefore concur in reversing the judgment, though I am unable to agree to the reasoning or conclusion of the majority.