WILLIAM A. SHARP *et al.* Appellees, *vs.* THE TRUSTEES OF
SCHOOLS *et al.* Appellants.

*Opinion filed December 17, 1913.*

1. DEEDS—*when a deed will be set aside for want of sufficient
mental capacity.* A deed will be set aside in equity at the suit of
the grantor's heirs where the preponderance of the evidence shows
that the grantor did not have sufficient mental capacity to manage
the property and protect her own interests, nor to reason in regard
to the value of the property and the effect of the conveyance, nor
to place her will in opposition to the request of the grantee for
the conveyance.

2. SAME—*court of equity may correct mistake in description of
land in deed.* A misdescription of land in a deed purporting to
convey, among other lands, forty acres which the grantor did not
own, will be corrected in equity, where the evidence is clear that
the description as to such forty was a mistake, and that both par-
ties intended the deed should convey another forty acres which the
grantor owned and of which the grantee was in possession when
the deed was made and thereafter continued in such possession.

3. APPEALS AND ERRORS—*when admission of incompetent evi-
dence will not reverse.* The admission of incompetent evidence in
a chancery case will not be ground for reversal where there is
sufficient competent evidence in the record to sustain the decree,
disregarding the evidence complained of.

APPEAL from the Circuit Court of Montgomery county;
the Hon. J. C. McBRIDE, Judge, presiding.

WILLIAM ABBOT, MILLER & McDAVID, JOHN L. DRYER,
and D. R. KINDER, for appellants.

WILLIAM N. RAGAN, HILL & BULLINGTON, and GEORGE
B. RHOADS, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The appellees, who are heirs of Mildred L. Sharp, de-
ceased, filed their bill for the partition of 170 acres of land
in Montgomery county, for the reformation of a deed con-
veying a part of the land, and the cancellation of a deed
executed by Mildred L. Sharp conveying the whole of it to

Peter C. Wood, because of her want of mental capacity. Answers were filed, a hearing was had before the chancellor, a decree was rendered granting the relief prayed for, an appeal was taken, and it is insisted that the decree is contrary to the evidence.

Peter C. Wood owned the land in 1862 and lived on it from that time until his death, in 1912. In 1868 he was a widower, and Mildred L. Sharp was a widow having five sons and a daughter. She went to live upon the premises as Wood's housekeeper in that year, taking her family with her, and from that time until her death, in 1909, she and her family and Wood lived upon the premises in the same house, practically as one family. Wood was an intelligent man of some education, well informed and given to much reading, but of intemperate habits with reference to the use of intoxicating liquors. He seems to have paid little attention to the farming of the land at any time and to have been engaged in no regular business after Mrs. Sharp's coming to the farm, except that for two years, about 1890, he kept a saloon in Coffeen. During this time he continued to live on the land, which was a mile and a half east of Coffeen. He had been in the civil war and received a pension, which was at first $10 or $12 a month but was later increased to $36 a month. He owned also, besides the land involved in this suit, 40 acres of land in Bond county and 100 acres more in Montgomery county, all of which he sold after Mrs. Sharp moved on his land and it is not involved here. Mrs. Sharp was an uneducated woman, unable to read or write, and was a hard worker. Her boys worked on the farm, some of them leaving as they grew up, but William, who is one of the appellees, remained with her and has worked on the farm all his life. There is no evidence as to the terms of the agreement under which Mrs. Sharp moved into the premises with her family. One side contends that Wood controlled the farm and its management; the other, Mrs. Sharp. There is evidence of circum-

stances to support either contention. The relations between them appear to have been entirely harmonious, and the weight of the evidence indicates that Mrs. Sharp took the lead in the direction and management of the business and work of the farm. In any event, in 1879 Wood conveyed to Mrs. Sharp, by warranty deed, the 40 acres on which was the house, being the north-east quarter of the north-west quarter of section 9, for the consideration, as stated in the deed, of $1000. There was a mortgage for $600 on the 40, which was subsequently released, and she gave her note, secured by a new mortgage, for $575. This was later renewed for a smaller amount and afterward paid. Afterward, on November 15, 1890, Wood executed a warranty deed purporting to convey to Mrs. Sharp, for the consideration of $3000, 150 acres of land, which included 20 acres not involved in this case. The 170-acre tract in controversy consisted, besides the 40 acres already mentioned as having been conveyed to Mrs. Sharp, of the south-east quarter of the south-west quarter of section 4, the south-east quarter of the north-west quarter and the west three-fourths of the north-west quarter of the north-east quarter of section 9, and the north half of the north-west quarter of the south-east quarter of section 10. The deed of November 15, 1890, purported to convey the portions of section 4 and section 10 just described, and the west three-fourths of the north-west quarter of the north-east quarter and the south-east quarter of the north-west quarter of section 10. It is this deed whose reformation is sought as to the south-east quarter of the north-west quarter of section 10. On June 15, 1891, Wood executed a warranty deed to Mrs. Sharp for the west three-fourths of the north-west quarter of the north-east quarter of section 9, stating therein that it was intended to correct an error in the deed of November 15, 1890. The evidence does not disclose the circumstances under which any of these deeds were made. They placed the legal title to the property in

Mrs. Sharp, and no reason appears in the evidence to suppose the transactions in which they were given were not what the documentary evidence indicates,—actual sales in good faith for the purpose of transferring the ownership of the property. Other motives may be conjectured, but they rest wholly on conjecture and have no foundation in the evidence. After Mrs. Sharp thus became the owner of the land the use and occupation of it continued as before, she conducting the farming operations with the assistance of her sons and Wood continuing to reside upon the premises with her and her family. Since she had the legal title to the premises and no equitable claim is shown by the evidence on the part of Wood or any other person, her occupation of the premises in the manner indicated must be regarded as the actual possession of the owner in accordance with the apparent title. The town collector's book each year from 1882 shows in the column provided for that purpose that the taxes on the land were paid by P. C. Wood. When the conveyances were made the officers making the collector's books made no change in the name of the person to whom the property should be assessed and it appeared on the books each year as assessed in Wood's name. It appears from the evidence that, even though the title was changed, land sometimes stood in the original name in the collector's book for years, and that it was customary to write in the column where the taxes are entered paid, the name of the person paying them. Considering the relation of the parties it is not strange that Wood should have paid the taxes to the collector, and the fact that he did so is not evidence that he paid them on his own account, since he claimed no title to the land, but rather on account of the person holding the title. The apparent relations of the parties to one another and to the land remained unchanged until Mrs. Sharp's death, in 1909, at the age of seventy-nine years. A change occurred, however, in the record title by virtue of a warranty deed executed by Mrs. Sharp to Peter

C. Wood on March 11, 1907, conveying the 170 acres in controversy for the purported consideration of $1000. This is the deed which is sought to be set aside. Peter C. Wood died April 7, 1912, leaving a will, whereby he devised all his real estate to the school trustees of town 7, north, range 3, west, in Montgomery and Bond counties, for the use of the inhabitants of said township for the use of schools. The circumstances under which this deed was executed are shown by the evidence. Negotiations were in progress with Wood for the purchase of the coal underlying the land, when, in making an abstract, the title was found to be in Mrs. Sharp. The abstracter called Wood on the telephone and told him of this condition, when Wood told him that he would have it arranged in a few days. In about ten days the deed of March 11, 1907, was placed on record. On the morning of the day the deed was executed Wood told Roy Pointer, a young man whom Mrs. Sharp had brought up and who lived on the place, to hitch up and take Mrs. Sharp to town to make the coal deed. Wood himself drove into Coffeen and Pointer followed with Mrs. Sharp, whom he left in front of the Studebaker Bank. Shortly afterward Wood and Mrs. Sharp entered the bank together, Wood having in his hand a paper which he handed to Studebaker, saying, "I wish you would take our acknowledgment to this paper." Studebaker wrote Mrs. Sharp's name, she made her mark, and Thomas Manley, who happened to come in, witnessed it. Studebaker put his seal on the paper and handed it to Wood. The paper, which was the deed in controversy, was neither read nor explained to Mrs. Sharp and no money was paid to her. Afterward Pointer met Mrs. Sharp and Wood in front of the bank and she got in the buggy with him and went home. The land at that time, exclusive of the coal, was worth $60 an acre and the coal was worth $10 an acre. Wood immediately sold the coal for that amount ($1700) and conveyed it to Theodore Rassieur on April 8, 1907. After the execution of this deed no change

took place in the management or possession of the land. Wood exercised no control over it, but Mrs. Sharp and her sons continued to farm it during the two remaining years of her life, and afterward her son William, and William's son, Lemuel, occupied and farmed it.

The testimony of the witnesses in regard to the mental ability of Mrs. Sharp, as is usual in controversies of this character, is conflicting and much of it of no particular value. The conflict is more in the opinions expressed than in the facts recited, and many of the opinions, judging from the facts recited, were expressed with an insufficient basis to give them much force. While Mrs. Sharp was entirely uneducated she was industrious, and until the last few years of her life seems to have prosecuted successfully the business of the farm. She acquired property, but to what extent she had the assistance of Wood or of her sons in its management or to what extent such assistance was necessary does not appear. With such agencies and such assistance as she had she became the owner of this land. About fourteen years before her death she injured her hand, which became enlarged and partly incapacitated her for work, and later on she was afflicted with rheumatism. These things weakened her physically, and a few years before her death she suffered a sunstroke, after which she did not work much. She was concerned in no business transactions for the last few years of her life, her dealings being confined to such things as bringing butter and eggs to market and exchanging them for groceries or other small household supplies, and even in these matters she trusted entirely to the merchant with whom she was dealing as to the quantity and value of what she sold and bought. She made small deposits in the bank and drew out small amounts, but Studebaker, the banker, said he knew she was not competent to transact business and he did not transact any business with her alone for this reason. G. W. Huffer went out to her house to see about getting an option on her coal

and was there three or four hours. He talked with her and found her a feeble old woman. He did not talk business with her and did not think she was able to transact business. All the evidence is not harmonious and there is contradictory evidence in regard to her actual condition. We shall not review the testimony of the witnesses in detail. Our conclusion from a consideration of all the evidence in the record is that Mrs. Sharp had not sufficient mental capacity to make the conveyance in question, to manage her property and protect her own interest. She had not the mental strength to reason in regard to the value of the property she was conveying and the effect of the conveyance upon her or to place her will in opposition to the request of Wood and protect herself in the transaction.

It is insisted that the evidence does not justify the correction of the deed as to the 40 acres. Wood did not own the 40 acres described in the deed, and it is therefore manifest that it was included in the deed by mistake. He did own the 40 acres in section 9. The same mistake as to the 30 acres was corrected when it was discovered. There was no other 40 acres with which Mrs. Sharp was concerned, and she continued in possession of the 40 acres in section 9 as before the deed was made. The fact that Wood included that tract in the deed of conveyance to him indicates that he understood that he had previously conveyed it to her. The court properly decreed reformation of the deed.

Objection was made to the admission in evidence of Mrs. Sharp's statement when going to Coffeen that she was going to fix the coal papers, and on coming back that she had fixed them. This evidence was incompetent, but there was ample evidence to sustain the decree without this or any of the evidence of whose admission complaint is made, and when that is the case a decree will not be reversed on account of the admission of incompetent evidence.

The decree is affirmed.                  *Decree affirmed.*