SEYMOUR IMPROVEMENT COMPANY *v.* VIKING SPRINKLER COMPANY.

[No. 12,908.   Filed March 9, 1928.]

180

*Thomas M. Honan* and *Montgomery & Montgomery,* for appellant.

*Seba A. Barnes,* and *Dixon & Meloy,* for appellee.

McMAHAN, J.—This is an action by appellee upon an alleged written contract between it and appellant to recover the contract price for the installation of an automatic fire-sprinkler system in a factory building owned by appellant and leased to Sam B. Wolf, Jr., and to foreclose a mechanic's lien. An answer of *non est factum* and a reply of estoppel closed the issues. A trial by the court resulted in a judgment for appellee on the contract for $3,049.96, there being no finding or decree on the issue relating to the alleged mechanic's lien. The errors assigned relate to the overruling of appellant's demurrer to the third paragraph of reply and the overruling of its motion for a new trial. The alleged contract, which was made a part of the complaint, was in the nature of a proposal made by appellee to appellant to install a sprinkler system in the factory building owned by appellant. This proposal was dated May 26, 1924, was addressed to "The Seymour Improvement Company," and, by its terms, proposed to equip the building of the improvement company with automatic sprinklers. Following the signature of appellee was a purported acceptance by appellant, reading as follows: "We hereby accept the foregoing proposal this 28th day of May, 1924. The Seymour Imp. Co., by J. M. Shields, Pres. Witness: Samuel B. Wolf, Jr." To this was attached a certificate of acknowledgment signed by Thomas M. Honan, notary public, wherein the latter certified that J. M. Shields, as president of the Seymour Improvement Company acknowledged the execution of the instrument. The contract price was $2,748, with provision for extra sprinklers at a designated price. One-fourth of the contract price was to be paid when the

materials were shipped to substantially commence the work, one-fourth when the work was completed, one-fourth thirty days after the date of approval by the Indiana Inspection Bureau, and the balance sixty days after such approval.

The third paragraph of reply alleges that at the time the contract sued on was executed, appellant was the owner of the premises described in the complaint, on which was situated a large brick building used for manufacturing purposes; that at that time and since said building was leased and used for the manufacturing of shoes; that a sprinkler system, such as was installed, was a practical, proper and economical equipment for manufacturing establishments, adding to and increasing the value of buildings so equipped and reducing the cost of insurance. That appellant, through its president, had notice and knowledge that appellant and appellee had entered into said contract and that the sprinkler system was being installed by appellee under said contract; that when the materials used in installing the plant were delivered to and upon said premises so owned by appellant, and before the same had been installed, appellee rendered and delivered to appellant a bill and statement for $687, and demanded payment thereof under said contract, the amount so demanded being the first installment of the contract price due under the contract; that on August 15, 1924, while said plant was being constucted, appellee rendered to appellant another bill and statement for $687, and demanded payment under said contract, the amount so demanded being the second installment on the contract, and that, from time to time thereafter, appellee rendered additional bills and statements for subsequent installments and demanded payment thereof. Appellant paid none of the installments and gave appellee no intimation or notice that it denied and disputed liability under the contract, or the authority of

its president to execute the contract, or the execution of the contract by J. M. Shields, its president, but, on the contrary, it remained and continued silent and permitted appellee to continue under and in reliance upon said contract. Appellee relied upon the contract and furnished the material for and installed the work wholly in reliance upon the contract, and believed that Shields, as president of appellant company, had the authority and right to execute the contract; that appellee would not have furnished the material and installed the plant except for said contract and its reliance thereon and belief that the same was valid and binding upon appellant; that appellee at all times was ignorant of any want of authority, right or power of Shields to execute such contract; that appellant still has and retains said sprinkler system in its said building, thereby enhancing the value thereof in excess of the contract price of $2,748, and is profiting by reduced insurance charges; and that, by reason of all of the aforesaid premises, appellant is estopped to deny the execution of said contract and liability thereunder.

The only objections to this reply as set out in the memorandum filed with the demurrer, and not waived, are: (1) That it does not allege that defendant misrepresented or concealed any material fact; (2) it does not allege that the defendant made any representations or concealed any matter with knowledge of the facts; and (3) that this paragraph of reply is a departure in theory and substance from the complaint.

Appellant in its brief makes two points and no more in support of its contention that the court erred in overruling its demurrer to this paragraph of reply. The first is, that no representation or concealment, by appellant, of any material fact is alleged; and second, that the reply tacitly admits the nonexecution of the contract by appellant, and pleads facts upon which appellee

asserts appellant should be liable for the value of the sprinkler system, which appellant says is a departure.

In so far as the contention that the reply is a departure from the theory of the complaint, we fail to see any reason to support that contention. The matter pleaded in the reply was a defense to the answer of *non est factum*. It did not set up any fact inconsistent with the allegations of the complaint, and did not amount to a departure. *Bowen* v. *Laird* (1906), 166 Ind. 421, 77 N. E. 852; *Brickley* v. *Edwards* (1892), 131 Ind. 3, 30 N. E. 708; *Walker* v. *Griffin* (1924), 107 Okla. 107, 232 Pac. 65.

The only other objection to the sufficiency of this reply which appellant makes in this court is that "no representation or concealment by appellant, of any material fact, is alleged." Does the reply allege a representation or concealment of a material fact? For a statement of the principles and elements of estoppel, see *General Realty Co.* v. *Silcox* (1925), 84 Ind. App. 451, 146 N. E. 408.

The reply alleges that appellant knew appellee and appellant, through its president, had entered into the contract to equip appellant's building with the sprinkler system, and knew the same was being installed by appellee under that contract; that when the material was delivered upon the factory premises of appellant, and before the same had been installed, appellee rendered and delivered to appellant a bill for the first installment which was due under the contract; that thereafter, while appellee was installing the system in the building, it from time to time rendered and delivered to appellant bills and statements for the several installments as the same became due under the contract and demanded payment thereof from appellant; that appellant gave appellee no intimation or notice that it denied or disputed liability for the installation of

the sprinkler system under the contract, or of the authority of its president to execute the contract, but that appellant remained silent and permitted appellee to complete the installation in its building under and in reliance upon said contract; that appellee relied upon such contract and furnished the material and work wholly in reliance upon the contract and believing that appellant's president had full authority and right to execute the contract; that appellee would not have furnished the materials and installed the plant except for such contract and its reliance thereon and belief that the contract was valid and binding upon appellant; that appellee was at all times ignorant of any want of authority of appellant's president to execute the contract. Clearly, under the facts as alleged, it was the duty of appellant to speak and not to conceal from appellee its claim that its president had no authority to execute the contract in the name of and for appellant. Under the facts as alleged, common honesty required appellant to speak and to notify appellee if its president had no authority to execute the contract, and not to knowingly permit appellee to install the plant in reliance upon the contract so executed by its president. Its silence and failure to speak amounted to the concealment of a material fact. The reply alleges that appellant knew its president had entered into the contract and that appellee was installing the sprinkler system in its building under that contract. It knew this before any of the materials had been placed in its building. It knew appellee was looking to it for payment and without giving any intimation or notice that its president had no authority to enter into the contract, it remained silent and allowed appellee to install the plant in the belief that the contract was a valid and binding contract.

While there must be a false representation or a concealment of material facts, silence, when it is the duty

of the party to speak, is equivalent to concealment. *Markland, etc., Co.* v. *Kimmel* (1882), 87 Ind. 560. This rule was applied to a corporation where the directors knew the president was contracting without authority and they made no objection. *Texas, etc., R. Co.* v. *Robards* (1883), 60 Texas 545, 48 Am. Rep. 268.

In order that the doctrine of estoppel may apply, actual knowledge of the facts is not necessary. If a party is bound to know the facts, or if his ignorance is the result of inexcusable negligence, he may be estopped without actual knowledge of the facts. *Stone* v. *Great Western Oil Co.* (1866), 41 Ill. 85; *Leathers Mfrs. Bank* v. *Morgan* (1885), 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; *Griffith* v. *Wright* (1882), 6 Colo. 248. A person signing an instrument without reading it is estopped to deny its obligation. *Taylor* v. *Fox* (1885), 16 Mo. App. 527. Negligence amounting to a breach cf duty supplies the place of intent. *Griffith* v. *Wright, supra; Pence* v. *Arbuckle* (1876), 22 Minn. 417; *Hardy* v. *Chesapeake Bank* (1879), 51 Md. 562, 34 Am. Rep. 325; *Stevens* v. *Dennett* (1872), 51 N. H. 324.

"It is not necessary to an equitable estoppel that the party should design to mislead. If his act was calculated to mislead, and actually has misled another acting upon it in good faith, and exercising reasonable care and diligence under all the circumstances, that is enough." *Manufacturers', etc., Bank* v. *Hazard* (1864), 30 N. Y. 226. There need not be a design to defraud in order to constitute an estoppel. *Pitcher* v. *Dove* (1885), 99 Ind. 175; *Kelley* v. *Fisk* (1887), 110 Ind. 552, 11 N. E. 453. Intent may be inferred. As was said in *Vanneter* v. *Crossman* (1880), 42 Mich. 465, 467, 4 N. W. 216, 217: "It is the act and not the intention that governs." "No fraudulent intention is required. It is enough if there would be a fraudulent effect from the evidence attempted to be set up." *Hill* v. *Black-*

*welder* (1885), 113 Ill. 283; See, also, *Tiffany* v. *Anderson* (1880), 55 Iowa 405, 7 N. W. 683.

A corporation may ratify the act of its president in entering into an unauthorized contract. Ratification need not be shown by an affirmative act of the board of directors. Ratification may be inferred. *National Life Ins. Co.* v. *Headrick* (1916), 63 Ind. App. 54, 112 N. E. 559; *Cole Carriage Co.* v. *Hacker* (1910), 45 Ind. App. 368, 90 N. E. 923; *Marion Trust Co.* v. *Crescent Loan, etc., Co.* (1901), 27 Ind. App. 451, 61 N. E. 688, 87 Am. St. 257.

Corporations have the power to waive their rights and are bound by estoppel *in pais* like natural persons. *County of Randolph* v. *Post* (1876), 93 U. S. 502, 23 L. Ed. 957; *Town of Newcastle* v. *Hunt* (1910), 47 Ind. App. 249, 93 N. E. 173; *Sheldon Hat, etc., Co.* v. *Eickemeyer Hat, etc., Co.* (1882), 90 N. Y. 607; *Town of Princeton* v. *Templeton* (1873), 71 Ill. 68.

This is founded upon the well-established rule that: "He who is silent when conscience requires him to speak, shall be debarred from speaking when conscience requires him to keep silent."

The reply is not subject to the objections urged and no error has been shown in the action of the court in overruling the demurrer thereto.

The next contention is that the court erred in the admission of certain evidence. The proposal of appellee to equip the building with the sprinkler system was a typewritten instrument, and, as first written, was addressed to "Wolf Shoe Company," and purported to be a proposal to equip the building of that company with automatic sprinklers. On the first page of the contract as it now appears, the words "Wolf Shoe Company" are stricken out and "The Seymour Improvement Company" inserted with a typewriter. In the body of the proposal, the name of the shoe company has been stricken out,

and the name of the improvement company written therein with pen and ink. These alterations appearing on the face of the instrument, appellee, acting upon the theory that the burden was on it to explain the altera·· tions before offering it in evidence, called as witnesses Mrs. Ruth Kight, and E. A. Gelhaus for the purpose of proving that the alterations had been made before the proposal was accepted by appellant.

Appellee contends that no question is presented relative to the overruling of the motion for a new trial, for the reason that none of the twenty-five specifications or reasons assigned in that motion are pointed out as being relied upon for reversal under the heading of "Errors Relied on for Reversal" in appellant's brief. Appellant, under the above heading, states that it has assigned and relies upon the following errors: (1) The overruling of its demurrer to the amended third paragraph of reply; and (2) the overruling of its motion for a new trial. Following the statement of the record as required in clause 5 of Rule 22, under a separate heading of each error relied on, and under the heading "Points and Authorities," appellant sets out two separately numbered points in support of the contention that the court erred in overruling its demurrer to the reply. Next, under a separately numbered paragraph, appears the following: "Second Assigned Error. Cause (a) Motion for New Trial, (Page 42, line 24, to line 10, page 43)." Then comes a statement that the court erred in overruling appellant's objection to a question asking Mrs. Kight what name Gelhaus requested her to write where the name Seymour Improvement Company now appears in the contract, which is followed by the statement that the question called for a self-serving declaration, with a reason why such declaration was not proper when made in the absence of the adverse party, and supporting authorities. The same plan is pursued

as to certain other specifications in the motion for a new trial. This is sufficient to overcome the objections made by appellee, although it would have been better if the several specifications in the motion for a new trial relied on for reversal had been set out immediately following the second assigned error and subordinate thereto, thus calling attention to each specification therein relied upon as error. We have examined the brief in *Husak* v. *Clifford* (1913), 179 Ind. 173, 100 N. E. 466, cited by appellee, and find that, under the heading "Errors Relied on for Reversal," the appellant set out the errors as in the instant case, but, under "Points and Authorities," appears a restatement of the assignment of errors and that the court "erred in overruling appellant's motion for a new trial." No attempt was made to point out what particular cause assigned in that motion was relied upon for reversal. That case is not in point and is not controlling in the instant case.

Mrs. Kight testified that, prior to her marriage, she did stenographic work for appellee; that, at the request of Gelhaus, who was the general manager of appellee, she prepared the contract in question; that on the first page, the name "Wolf Shoe Company" had first been written where the name of appellant, "Seymour Improvement Company," now appears. She was then asked what name Gelhaus directed her to insert in the contract when he first requested her to prepare it. Appellant objected to this question for the reason that the answer sought to be elicited was a "self-serving declaration." The objection being overruled, she said he directed her to write "The Wolf Shoe Company." In answer to a similar question and over a like objection, she testified that, on the last page of the contract, where the words "Seymour Improvement Company" occur, he first directed her to write "Wolf Shoe Company." She then, in answer to further questions and without any objection, testified

that, later in the day, he returned the contract to her and told her the name of appellant was to be substituted where the name of the shoe company had been placed; that she made the change on the first page where she could get it in the typewriter, and that, on the second page, where she could not make the change with the machine, Gelhaus, in her presence, made the change with ink; that, after these changes had been made, she gave it to Gelhaus, and at that time it had not been signed by appellant.

Gelhaus testified, that, in response to a prior call, he went to the office of Sam B. Wolf in Cincinnati, May 26, 1924, and there met a Mr. Kaufman. In answer to a question asking what negotiations took place there in the presence of Wolf and Kaufman, he testified that Wolf said Kaufman represented the Seymour Improvement Company and that they were going to pay the bill and that he, in turn, would make arrangements with the improvement company to reimburse it. Appellant objected to this question for the reason that appellant "was not there and not represented by any one authorized to act for it, in buying or installing this sprinkler system in its property." Without any further objection, he also testified that before this conversation at Wolf's office, the contract had been prepared at his office in the name of the shoe company; that while at Wolf's office, Wolf, in the presence of Kaufman, told him to change the contract; that he took the contract, which was in duplicate, to his office, had the changes made, after which he took the contract and copy back and handed them to Wolf, who, in turn, handed them to Kaufman, who put them in his pocket, and who, as the witness was informed, was going to take them to Seymour to have them signed; this was on Monday and, on the following Thursday, he received by mail one copy signed just as

it now is, without any changes having been made in it after it was turned over to Kaufman.

In support of the contention that the court erred in overruling appellant's objections to the questions asked Mrs. Kight, appellant says: "Self-serving declarations can not become evidence for the party who makes them unless made in the presence of the adverse party with an opportunity to reply." It was proper for appellee to prove the circumstances surrounding and connected with the execution of the contract and to show that the name of the shoe company was first inserted therein and that thereafter that name was stricken out and the name of the improvement company inserted before the contract was signed.

The witness Gelhaus, without objection, testified substantially to the same facts as did Mrs. Kight. Since the testimony of Gelhaus, to which objection was made, related to the alterations in the contract, we will consider the objection to his testimony in connection with the objections to the testimony of Mrs. Kight.

Appellant complains of the overruling of its objection to the question asked the witness Gelhaus as to what negotiations took place in the presence of Wolf and Kaufman. Kaufman was the agent for appellant in the negotiations which led to the leasing of the building, in which the sprinkler system was afterwards installed, to Sam B. Wolf, Jr. He was a stockholder and, at one time, a director of the improvement company, although the evidence is that he was not a director at the time mentioned by Gelhaus. Kaufman denied being present at the time referred to by Gelhaus and says he did not take the contract to Seymour to have it signed. He says he was at the office of Wolf on one occasion when Gelhaus was present and when there was a talk about installing a sprinkler system in the building at Seymour. He also testified as to his recollection of

the negotiations and conversation that took place while he and Gelhaus were at Wolf's office. The purpose of the testimony to which the objections were made was to explain the alterations and to prove they were made before the contract was executed. It went to that one question and no other. It had no bearing on the question as to whether the proposal was thereafter accepted by appellant. It had no bearing on the question of ratification or estoppel. As tending to show when and how the alterations were made, the testimony of each of these witnesses to which the objections were directed was competent and proper. In such cases extrinsic evidence is admissible. The door being opened to the admission of evidence on the question, no reason exists for excluding any evidence which directly tends to establish the actual facts. *Cox* v. *Mignery & Co.* (1907), 126 Mo. App. 669, 105 S. W. 675; *Palmer* v. *Emery* (1900), 91 Ill. App. 207. The statements of Gelhaus to Mrs. Kight, as testified to by the latter, were in no sense self-serving in character. If, in his conversation with her, he had given her any reason for his action in inserting the name of the shoe company when the contract was first written, or for inserting the name of appellant, such statement to her as to his reasons for making the change might have been objectionable. *Windham* v. *Howell* (1907), 78 S. C. 187, 59 S. E. 852. It was proper, however, for Gelhaus, as a witness, to explain why and how the alterations were made. *Robinson* v. *State, ex rel.* (1877), 60 Ind. 26, 36. The court did not err in overruling the objections to the questions asked Mrs. Kight. And, even if it was error to allow Gelhaus to state what negotiations took place at Wolf's office, his answer was not such as would amount to reversible error, in the instant case, where the cause was tried by the court without a jury.

The admission of immaterial evidence when the cause

was tried by a jury has been held not reversible error. *Cook & Bernheimer Co.* v. *Hagedorn* (1921), 82 Ind. App. 444, 131 N. E. 788; *Indiana Union Traction Co.* v. *Hiatt, Admr.* (1916), 65 Ind. App. 233, 114 N. E. 478; *State, ex rel.,* v. *McNelis* (1919), 72 Ind. App. 231, 122 N. E. 690. But in *Massachusetts Bonding, etc., Co.* v. *Free* (1919), 71 Ind. App. 275, 124 N. E. 716, where there had been a trial by jury, this court said: "The admission of improper evidence of a fact is harmless when the verdict is supported by other sufficient evidence." In such a case, if the evidence is directed to a point in issue, it will be presumed to be prejudicial unless the record shows the contrary. *Johnson* v. *Anderson* (1896), 143 Ind. 493, 42 N. E. 815; *Brunker* v. *Cummins* (1892), 133 Ind. 443, 32 N. E. 732.

The rule applicable to jury trials is not so strictly applied in cases tried by the court without a jury. As was said in *Shira* v. *State, ex rel.* (1918), 187 Ind. 441, 119 N. E. 833: "The admission of irrelevant testimony which has little, if any, probative force does not constitute reversible error where there is nothing to indicate that the complaining party was, or could have been, harmed by its introduction, particularly where the issues were tried by the court without the intervention of a jury, as in this case, and the decision does not depend on the incompetent evidence for its support." So, this court in *Grasselli Chemical Co.* v. *Simon* (1925), 84 Ind. App. 327, 332, 150 N. E. 617, where it was urged that the cause should be reversed because of the admission of incompetent evidence, said: "But, as there is other competent evidence in the record sufficient to sustain the finding herein, we cannot, under the well-settled rule, reverse this case because of such error; it was harmless."

Where there is sufficient competent evidence to sustain a finding in a case tried by the court without a jury,

the admission of incompetent, irrelevant and immaterial evidence is not cause for reversal. *Shedd* v. *Seefeld* (1907), 230 Ill. 118, 82 N. E. 580, 13 L. R. A. (N. S.) 709, 120 Am. St. 269; *Allen* v. *McGill* (1924), 311 Ill. 170, 142 N. E. 470; *Shira* v. *State, ex rel., supra; Bowers* v. *Headen* (1853), 4 Ind. 318; *Bowen* v. *W. O. Eaton & Co.* (1909), 46 Ind. App. 65, 89 N. E. 961. In *Halstead* v. *Coen* (1903), 31 Ind. App. 302, 67 N. E. 957, where the court submitted certain questions of fact to the jury, but later disregarded the finding of the jury, it was held not prejudicial. If the record shows the finding of the court rests on incompetent evidence, the judgment will be reversed. *Buffalo, etc., Quarries Co.* v. *Davis* (1910), 45 Ind. App. 116, 90 N. E. 327. The introduction of immaterial evidence that has no tendency to mislead the trial judge as to any of the facts on which the rights of the parties depend is not cause for reversing the judgment. *Brier* v. *Childers, Admr.* (1925), 196 Ind. 520, 148 N. E. 474.

Judgments will only be reversed on account of error in admitting evidence, when the competent evidence fails to support the finding of the court, or where it appears that the trial court was influenced by the improper evidence, or where the appellant was harmed by the improper evidence. Thus, in *Mammoth Mining Co.* v. *Salt Lake, etc., Co.* (1894), 151 U. S. 447, 14 Sup. Ct. 384, 38 L. Ed. 229, it was held that where the evidence objected to was cumulative in its character and not of controlling importance, and if excluded, it was clear that the result would not have been otherwise than it was, the admission of evidence, if erroneous, did not constitute reversible error. To the same effect see *Sharp* v. *Trustees of School* (1913), 261 Ill. 44, 103 N. E. 562; *Waters* v. *Merits Pants Co.* (1905), 76 Ark. 252, 88 S. W. 879; *Kimball* v. *Edwards* (1914), 91 Kans. 298, 137 Pac. 948; *Cook* v. *Penrhyn Slate Co.*

(1880), 36 Ohio St. 135, 38 Am. Rep. 568. We will not undertake to cite all the authorities on this question, but for a long list of such see 4 C. J. §2982, p. 999. If the testimony to which the objection had been made had been stricken out or not admitted, it is not probable the court would have reached a conclusion different from the one it did reach.

Appellant next contends the court erred in permitting appellee, in making out its case in chief, to introduce evidence tending to show that appellant had ratified the act of its president in executing the contract, and to support its reply of estoppel. It is appellant's claim that no evidence of ratification and estoppel could be introduced except in rebuttal. There is no merit in this contention. Under the answer of *non est factum*, appellee was required to introduce all of its evidence tending to prove the execution of the contract, or that its execution by the president of appellant had been ratified by appellant, or that appellant by its acts was estopped to deny the execution of the contract, before the contract could be introduced in evidence. *Baum* v. *Palmer* (1905), 165 Ind. 513, 76 N. E. 108.

The contention of appellant that the decision of the court is not sustained by sufficient evidence, and that it is contrary to law, is based upon three propositions: (1) "There is no evidence whatever of the execution by appellant of the contract in suit and decision without evidence to support it is contrary to law"; (2) "It cannot be claimed by appellee that appellant in any manner ratified the execution of the contract in suit"; (3) that the decision rests on the third paragraph of reply which "charges that appellant stood by in silence and permitted its property to be enhanced in value," and that "the complaint declares upon an express contract to buy the fixtures at an agreed price."

In so far as the first proposition is concerned, it was not necessary for appellee to show as a fact that the contract was executed by appellant. When an ■ answer of *non est factum* is filed, the plaintiff can admit the contract sued on was not executed by the defendant, and rely upon ratification of the contract or upon estoppel to deny its execution.

Under the third proposition appellant states three points with supporting authorities. These points are as follows: (1) "Appellee must recover, if at all, on the cause of action stated in the complaint, and not on one stated in the reply"; (2) "the test of a departure from the pleadings is whether evidence of facts alleged in the reply could be received under the allegations of the complaint"; and (3) that the evidence shows the officers and directors of appellant did not buy the sprinkler system, had no knowledge of the existence of the contract sued on, or that appellee claimed to have such a contract, or that the sprinkler system was being installed, and ends with the following statement of law: "For an estoppel to arise from silence, the person upon whom the duty to speak rests must have an opportunity to speak and knowledge of the circumstances requiring him to speak. His silence must amount to bad faith."

Certainly a party must recover on the cause of action stated in his complaint, but, in an action upon a contract, the execution of which is denied under oath, the ■ plaintiff may recover upon proof that the defendant ratified the contract, or that the defendant is estopped to deny the execution of the contract. In such cases, the plaintiff is not required to anticipate an answer of *non est factum* and to allege in his complaint facts to avoid or overcome such answer.

The general rule is that an answer of *non est factum* closes the issues and that no reply is necessary, although

a reply of estoppel has been recognized as proper.

21. *Brickley* v. *Edwards* (1892), 131 Ind. 3, 30 N. E. 708.

We cannot agree with the statement that the evidence conclusively shows, without contradiction, that appellant's directors and officers had no knowledge of the existence of the contract, or that appellee claimed to have such a contract, or that the sprinkler system was being installed. The evidence is, as we shall hereafter show, sufficient to justify a finding that appellee was claiming that appellant was under an obligation to pay for the sprinkler system and that appellant knew it was being installed. We do agree with appellant in its statement of the law as to silence.

Dr. James M. Shields, who was a director and president of appellant, when first called as a witness, testified that he recalled being in Thomas M. Honan's law office when he signed the contract; that Honan was present; could not recall any one else being present; could not say whether Sam B. Wolf, Jr., was present or not. On cross-examination, he said the contract had been changed since he signed it by substituting the name of the improvement company for the shoe company. No one representing appellee ever requested him to sign a contract. Never saw the contract sued on until after suit had been commenced, but, in answer to questions asked by counsel for appellee, he said he saw the paper he signed, *first and last in Honan's office;* did not know what became of it; did not know and had no idea who requested him to go to Honan's office; would not go on record as ever having seen the document; put his name on that "sheet of paper," but did not sign that document; did not know who asked him to put his name there. On recross-examination, he said the paper he signed and left at Honan's office purported to be a consent for the installation of the sprinkler system by the shoe company;

*never read or knew of the contract in suit until after suit was commenced;* that by hearsay he knew when the installation of the sprinkler system commenced. At this point, in answer to questions asked by the court, he testified as follows: "I never had this instrument to which the name Seymour Improvement Company, by J. M. Shields, President, is attached, in my possession. It was in Honan's office when I was there. That was the only time I could have had it. Honan or some one else called me there. I can't say that I talked with Honan. That is my signature and I wrote it, and where the Seymour company now appears, there was the name of some shoe company. This appeared over on the second page—The Sam B. Wolf Shoe Company. I recall that distinctly, the contract of the Wolf Shoe Company. *I read it in part and knew it in part from conversation.* I presume I read that part in large type 'hereby accept the foregoing proposal.' I did not see the words 'our price for the work herein specified will be $2,748' in distinct type before my signature." And, in reply to a question asked by counsel for appellant as to whether he had signed the paper at the *First National Bank* or at Honan's office, he said he signed it at the bank *in the presence of C. D. Billings,* and that this was the only signature he made. He was then re-examined by counsel for appellee, and testified that, in the presence of Billings, he filled in what was called a consent by a man from Springfield, Ohio; that this man was not in Honan's office; that no one was in Honan's office representing appellee. And then, in answer to questions asked by the court, he said: "I can't say that I have any recollection of signing two papers. I do have a distinct recollection as I say of signing this consent in the First National Bank in the presence of Billings. Honan was not there, but some man from away was there. I don't remember the circumstances of the transaction

at Honan's office and the making of this signature. I don't remember positively of being there, although I feel that I was. The one signature I remember positively and the circumstances of signing it at the bank. I do not know that the signature on exhibit A (the contract) is not the signature that I made to something called a consent made in the First National Bank." He then testified, in response to questions asked by counsel, as follows: "I believe I testified before dinner that I went to Honan's office, and who was there, and I say now that I don't remember because I do remember this other signature. I think the fellow that got my signature at the bank carried it away with him, and I think I left this document (the contract) in Honan's office. Honan was certainly present and took my acknowledgment. I think I did testify before noon that I think I put my name to the contract in Honan's office, but I am not going to commit myself. I think the ink used by me in my signature, and that used by Honan is the same."

C. D. Billings, a witness for appellant, testified, among other things, that he was president of the First National Bank and a director and vice-president of the improvement company; knew the shoe company was acquiring a sprinkler system; that Dr. Shields came into the bank with a stranger and said the shoe company was buying a sprinkler system and that they came there with a contract and it was necessary to have "our consent in order to do that, and asked me what I thought would be the propriety of our giving our consent. I told him I didn't see why we should refuse that and Dr. Shields said he would sign the consent with the proviso that it would not involve any liability on the part of the Seymour Improvement Company, and the gentleman wrote that statement on one of the papers there. Dr. Shields

signed that statement in my presence and in the presence of this gentleman." .

Thomas M. Honan, one time attorney general of this state and a prominent lawyer in Seymour, and a director of the improvement company, testified in part as follows: "At the time I attached my signature and certificate and seal as Notary Public, I had not seen and did not know the contents of that paper, and I now have no recollection of ever signing that paper. I have tried in every way, but I cannot recall the transaction at all, or when or where that paper was signed."

Kaufman testified that he made a number of trips to Cincinnati and conducted the negotiations between the shoe company and the improvement company that resulted in the leasing of the building and the location of the shoe company at Seymour; that, on one occasion, he met Gelhaus at the Wolf plant and discussed the sprinkler proposition in the presence of Gelhaus and the Wolfs; did not remember how often he met Gelhaus there, but was positive he met him there once and had a conversation with him in the forenoon of the day; was not sure whether Gelhaus returned again in the afternoon when another conversation was had with him; believed Gelhaus had an appointment with the Wolfs for that day; this was on Monday; that neither contract in suit nor any other paper was delivered to him that day and carried away with him; that he made a number of trips to Cincinnati in connection with locating the shoe factory, but that he did so as a citizen and not as a representative of appellant. In answer to a question asked by the court as to whether he carried anything from Wolf's office to any one in Seymour, he answered: "It occurs to my recollection that this contract could not be properly signed without getting the consent of the owner of the building. I am not sure if I carried it but it was only a

contract for the consent of the owner of the building."
In response to further questions by the court, he testified
he did not remember whether he carried any document
to Seymour; believed he would have remembered to
whom he had given it if he had; Gelhaus, Wolf and the
witness were talking at Wolf's office; the shoe company
and the sprinkler company were the only ones talked
about; was a stockholder in the improvement company;
and was interested in locating the factory. In explain-
ing how he happened to be there when they were talking
about the sprinkler, he said: "I was interested in locat-
ing the factory, and if there was anything like that, he
would call me in. I was in the room talking to Sam B.
Wolf, Sr., when Gelhaus came in." He supposed Gel-
haus came there by appointment. Did not know
whether Wolf called him or not; this was on Monday and
he returned to Seymour that afternoon. The testimony
of this witness corroborated Gelhaus' testimony as to
the meeting at Wolf's office and the conversation about
the sprinkler and the carrying away of some paper.

Sam B. Wolf, Sr., was also a witness, whose memory
was, to say the least, conveniently poor. He had no
recollection of Gelhaus and Kaufman being at his office
at the same time. He would not commit himself on
that subject. When shown the contract in suit, he
would not say he had not seen it before; did not remem-
ber seeing it. Knew the Seymour Improvement Com-
pany, but did not know any of them except Honan;
thought he knew Shields. Although he was president of
the Sam B. Wolf Sons Company, did not know whether
it ever had any business transaction with the improve-
ment company; Sam B. Wolf Sons Company paid rent
to Sam B. Wolf, Jr., his company occupied the building
and his son was the *possible* owner of it, if he ever paid
for it. Did not personally know of any arrangement by
which the company was to reimburse the improvement

company for the sprinkler system. *It might have been possible*, but he did not remember. Would not say Gelhaus and Kaufman were not at his office together. Had no recollection whether there was a contract between the shoe company and the sprinkler company.

There were four directors of the improvement company in addition to Shields, Billings and Honan. Three of these testified in substance that the subject of buying or installing a sprinkler system in the factory building was never brought before the board and no action was taken by their company on the subject; that there was no motion or resolution or action of the board directing or authorizing Shields as president to do anything on that subject; that they had no personal knowledge that the sprinkler system was in fact being installed and never knew until suit was commenced that appellee claimed to have a contract with appellant.

Clark B. Davis testified that he was the secretary and treasurer of appellant, and that all correspondence of appellant came to him; the bills and statements which were sent to appellant were received by him. He showed the first one to Kaufman and to Dr. Shields. There was a meeting of the board of directors of appellant July 23 or 24, 1924. He had forgotten how many bills there were; did not recall that Shields said anything about having signed a consent, when he showed him the first bill; did not remember that he ever called the attention of the directors to any of the bills; did not remember that he ever showed the second bill to any one, just stuck them away in his desk; did not write appellee or the shoe company about them.

The trial court was doubtless more impressed with what these witnesses did not know and remember than with what they did know. It is quite patent that the testimony of Dr. Shields is very unreliable and uncertain. At one time, he says he signed the contract in suit at

Honan's office, that he *read it in part and was informed in part as to its contents;* that, at the time, he observed that the name of the shoe company appeared where the name of the improvement company now appears. He never saw that paper *before or since.* It was left in Honan's office. No one is shown to have been in Honan's office at that time except Dr. Shields and Honan. If Shields read the contract as he says he did, it was certainly in the presence of Honan, and no other person.

According to Shields and Billings, another paper was signed by the former in the presence of the latter at the First National Bank, at a time not disclosed. This paper, according to the testimony of these witnesses, was what purported to be a consent by appellant to the installation of the sprinkler system by the shoe company, that presumably was occupying the building through some arrangement with Sam B. Wolf, Jr., who held a lease for the building with an option to purchase the same. There is no contention or claim made that the paper signed by Shields at the bank is the one that he signed and acknowledged before Honan.

The parties doubtless were of the opinion that the instrument which was signed at Honan's office was of considerable importance. It was of such importance that it called for an acknowledgment of the same before some officer. It would also seem, from Shields' testimony, that he signed and acknowledged the same without consulting with the other directors of his company, although it would be more reasonable to believe he consulted with Honan before he signed it, since some one informed him of its contents. At this point, we call attention to the fact that Honan does not claim he did not have personal knowledge that the sprinkler system was being installed. All he says about it is that he did not *see* it while it was being put in. And it would also appear that Shields signed the paper at the bank without

consulting with any of the directors except Billings. There was evidence from which the trial court would have been justified in finding that both of these documents were executed by Shields as president of the improvement company without conferring with the other members of the board of directors. When the secretary received the bills for the sprinkler system, the only director to whom he went for advice was Shields. The court might have drawn the inference that Shields, as president of the company, was the active member of the board; that it was the custom of the board to permit the president to act for the board without any direct and specific orders. Indeed, the court might not have been wrong if it had concluded that Shields was the controlling spirit on the board and that the other members were figure-heads.

There is no evidence that the signature of Shields was procured by fraud or that he was prevented from examining and reading the contract before he signed it. In fact, he says he read it in part, and being able to read, he is chargeable with knowledge of its contents, even if he did not read it.

The knowledge possessed by the secretary was the knowledge of the improvement company and, when considered with the other evidence, was sufficient notice to require appellant to speak, and to inquire why it was being charged with the cost of installing the sprinkler, and, if it was going to repudiate the act of its president and deny its liability, to notify appellees of such intention before the sprinkler was installed in its building.

In *Pittsburgh, etc., R. Co.* v. *Ruby* (1871), 38 Ind. 294, 322, 10 Am. Rep. 111, the court, in discussing the effect of notice to an agent of a corporation, said: "We think that notice to an agent of a corporation, relating to any matter of which he has the management and control, is notice to the corporation, and we do not see any reason

why this rule is not applicable here. . . . As it was the duty of the master of transportation to communicate all matters concerning his agency to his principal, it may be presumed he did so. But whether he did so or not, notice to him is notice to his principal, when it relates, as it did here, to the business which he was transacting for the company." And, as was said in *Baulec* v. *New York, etc., R. Co.* (1874), 59 N. Y. 356, 17 Am. Rep. 325: "The corporation should be regarded as constructively present in all acts performed by its general agents within the scope and range of their ordinary employment."

In view of the knowledge which the secretary and president of appellant possessed, and which knowledge is imputed to appellant, it would certainly seem that appellant had reasonable grounds to suspect or believe that appellee, in installing the sprinkler system, was doing so under such conditions as caused it to look to appellant for payment of the cost of the sprinkler. It was bound to know, and, as a matter of law, did know, that appellee was claiming that appellant, for some reason, was obligated to pay the bill. Appellant knew there had been negotiations on the part of appellee for the installation of the sprinkler. Kaufman, Billings, Shields and the secretary of appellant had personal knowledge of such fact. Shields talked with Billings about this when the man from Ohio and Shields were in the bank, and when Shields signed what he says was a consent of the Seymour Improvement Company that the Sprinkler might be placed in its building. There is no claim or contention that Shields did not have authority to sign that consent. When this was done is not disclosed by the evidence. It is a fair inference that Shields and Honan conversed with each other about the subject-matter of the contract when it was signed and acknowledged by Shields, and when Shields, as he says, was *informed* as to its contents. Honan makes no claim

that he did not know appellee was installing the sprinkler in the building.

Shields signed and acknowledged the execution of the contract. Sam B. Wolf, Jr., signed his name as a witness to the same. Thomas M. Honan, who was a prominent lawyer and a director of the improvement company, took Shields' acknowledgment. Shields saw the contract, read it in part, and was informed by some one as to the contents of the instrument he signed. Both Wolf and Honan say they have no recollection touching the transaction. Wolf had no recollection of being present or of having ever seen the contract in question. Shields, when first interrogated as a witness, recalled being at Honan's office and signing the contract and says Honan was present. On being examined by appellant's attorney, he said the contract had been changed since he signed it. How he knew it had been changed, unless he had read it and knew what he signed when he signed it is not disclosed. It seems rather strange that all three of the witnesses who ought to be able to give some information concerning the execution of the contract are not able to do so. Wolf, having no recollection of the transaction, could, of course, give no information as to how he chanced to be present or from whom the contract came or what became of it after it was signed. Honan, like Wolf, gave no information. All the information Shields gave was that he was never requested by appellee or any one representing it to sign the contract; that no one representing it was present when he signed it. He did not know who requested him to go to Honan's office. He first saw the contract at Honan's office. He did not know who asked him to sign it. He saw it last at Honan's office. It was on the table in Honan's office, and he did not know what became of it.

No one interested in appellant company, or connected

with it, except Kaufman, ever saw or conversed with any one connected with appellee until after the sprinkler had been installed, and at a time when appellee was trying to collect its pay." Without setting out the evidence *in extenso,* it is sufficient to show that appellee acted in good faith and installed the sprinkler, believing that Shields had authority to sign the contract, and that if it had not so believed it would not have installed the sprinkler. In this connection, it is important to note that, before any of the material was installed in the building, appellee sent a bill to appellant for one-fourth of the contract price. If appellee had been guilty of fraud as intimated by counsel for appellant, it would have been more apt to have refrained from sending the bills to appellant until the plant had been fully installed or at least until a material part of it had been installed. Its promptness in sending the bills to appellant is some evidence of good faith.

The trial court found that Shields as president of the improvement company signed and acknowledged the contract in question; that the changes and alterations appearing on the face of the contract were made before execution; that immediately after the materials were shipped, appellant received from appellee a bill for the part of the contract price then due under the terms of the contract; that this bill was received by the secretary of appellant in the scope of his employment; that the secretary showed this bill to the president of appellant, who had signed the contract after reading it, in part at least, and who, under the law, knew its terms. There was evidence to sustain a finding that appellant had, in March, 1924, leased the building to Sam B. Wolf, Jr., for a term of ten years, with an option by which the lessee at any time within ten years could buy the property at a fixed price; that appellant had consented to the installation by the tenant of the sprinkler system in the

building, so that the property would be subject to a mechanic's lien for the cost of the system when installed. It is to be observed, however, that the alleged consent was not introduced in evidence, and no effort was made to prove the terms thereof. It is also to be observed that one of the directors of appellant did not testify. We do not know what he knew or why he did not testify.

Appellant, through its secretary and president, knew that appellee had shipped the material for the system and was proceeding to install the same. It knew its property would be enhanced in value and the insurance rates thereon materially reduced by the installation of the sprinkler system, and it knew, before the material had been put into the building, that appellee was looking to it for the payment of the sprinkler system as disclosed by the bills which appellee sent to appellant, purporting to be for an automatic sprinkler to be installed in appellant's building, then occupied by the shoe company, and which sprinkler, the bills indicated, had been sold to appellant. Why would appellee have sent five bills to appellant for the contract price of the sprinklers if appellant had not agreed to pay for the same? Why was appellee looking to appellant for payment? These questions should have been considered by appellant when it received the bills from appellee. With the knowledge possessed by its secretary and president, appellant remained silent and, without making any inquiry as to why it was being charged for the materials, knowingly permitted the sprinkler system to be installed. If appellant, when it received the first bill from appellee, had denied liability, or had even made inquiry as to why the bill had been sent to it instead of to the lessee of the building, it doubtless would at that time have learned of the provisions of the contract which its president had executed in its name, before any of the material had been placed in its building. While

some of the directors of appellant testified they had no knowledge of the existence of the contract, or of the fact that the sprinkler was being installed in its building, the evidence is of that character that the trial court was justified in finding that they had sufficient knowledge to put them upon inquiry. Indeed, the court would have been justified in inferring that the several directors had notice and knowledge. For instance, Shields testified that he did not know when the installation of the sprinkler was commenced or that it was being installed, but he said that "legally" he knew it was being installed. He explained this by saying he knew it by "hearsay." And that is probably what the other directors meant when they testified they did not know "personally" about the sprinkler being installed or about the receipt of the bills by the secretary. When the secretary and president learned of these things in the scope of their official duties, the law says appellant knew all the facts so learned by its officers, and it is estopped to deny such knowledge.

The presumption is that Shields and Davis reported the receipt of the bills to the board of directors. But, as was said in *Pittsburgh, etc., R. Co.* v. *Ruby, supra:* "But whether he did so or not, notice to him is notice to his principal." And we hold that appellant was bound to take notice of the bills which were sent to it and received by its secretary, and of all information which a reading of the several bills and reasonable inquiry would have disclosed.

"While a president, or other officer, of a corporation may have no authority by virtue of his office, or by express sanction of the board of directors, to incur obligations in behalf of the corporation, yet if he is held out by the managers, in the general course of business, as being the agent of the corporation, with such authority, his acts in incurring obligations will be binding upon the

corporation." *Evansville Public Hall Co.* v. *Bank of Commerce* (1896), 144 Ind. 37, 42 N. E. 1097.

"The well-established rule as to private corporations is that, when a contract is made by an agent of a corporation in its behalf and for a purpose authorized by its charter, and the corporation receives the benefit of the contract without objection, it may be presumed to have authorized or ratified the contract by the agent." *Scott County* v. *Advance-Rumley Thresher Co.* (1923), 288 Fed. 739, 36 A. L. R. 937, 945.

The Supreme Court of the United States, in *Pittsburgh, etc., R. Co.* v. *Keokuk, etc., Bridge Co.* (1889), 131 U. S. 371, 9 Sup. Ct. 770, 33 L. Ed. 157, 160, said: "When the president of a corporation executes, in its behalf, and within the scope of its charter, a contract which requires the concurrence of the board of directors, and the board, knowing that he has done so, does not dissent within a reasonable time, it will be presumed to have ratified his act. . . . And when a contract is made by any agent of a corporation in its behalf, and for a purpose authorized by its charter, and the corporation receives the benefit of the contract, without objection, it may be presumed to have authorized or ratified the contract of its agent."

In *Union Gold Mining Co.* v. *National Bank* (1877), 96 U. S. 640, 24 L. Ed. 648, the mining company was a New York corporation with mines in Colorado. One Sabin had leased part of its mines, and professed to carry on another portion of them on account of the company. Becker was president of the company and spent part of his time in Colorado looking after the company's business there. Efforts were made to show authority of Sabin to draw checks in the name of the company, and, failing in that, to establish a ratification of his acts by which the company would be bound. To this end, the knowledge of Becker of what was done by

Sabin and his action in relation thereto, were given in evidence. The court charged that the jury might assume that, prior to a named date, Sabin had no authority to borrow money in the name of the company, but that it was competent for the company to ratify his acts; that if Sabin was its agent and borrowed money in its name, which was expended in its business, that payment thereof was demanded of the company, the jury was to consider whether the company, with knowledge of the fact, assented to such demand and approved the act of Sabin; that if an act has been done by an agent in excess of his authority, if the principal on being informed of his act fails to disavow it in a reasonable time, his silence may be considered as an acquiescence and assent to the act done. It appeared from the evidence that on the date mentioned in the instruction, Becker closed up the accounts of the company and then learned the amount of the indebtedness which had been incurred by Sabin to the bank in the name of the company. "This," said the court, "was a clear and distinct notice to Becker of the action of this agent of his company in its name. Becker, as president of the company, was the suitable man to receive the information; and what he said and did about it, and what action in repudiating the doings of Sabin was taken by the company, or whether there was no disavowal, might well be learned from its chief officer." It was held proper to show Becker's knowledge of the indebtedness and the demand on him for its payment. In discussing the instruction relating to ratification, the court said: "It was in substance, that if Sabin was the agent of the company in working its mines in Colorado in 1867 and 1868, without authority to borrow money in its name, but did in fact borrow large sums of the plaintiff in its name; if, on the 16th of December, 1868, the president of the defendant's company was informed of such borrowing and of the amounts, and

a demand was made for the payment thereof, and if within a reasonable time thereafter the company failed to disavow the acts of its agent in so borrowing the money, the jury would be authorized to consider the company as assenting to what was done in its name. We consider this charge entirely correct."

It is settled law that a corporation may ratify the acts of its agents done in excess of their authority, and such ratification may, in many cases, be inferred from an informal acquiescence in those acts.

The circumstances which put a corporation upon inquiry are the same as those which will put an individual upon inquiry. A corporation will be charged with notice of matters affecting the corporation where its officers have knowledge of facts which would put a prudent person on inquiry that would lead to this knowledge. The law imputes to a corporation knowledge of facts which its directors ought to know, in the exercise of ordinary diligence in the discharge of their official duties, when the imputation of such knowledge to the corporation is necessary to protect the rights of third persons. The directors are presumed to know that which it is their duty to know and which they have the means of knowing. 3 Thompson, Corporations (3d ed.) §1783.

Suppose there had been a meeting of the directors of appellant company at the time its secretary received the first bill from appellee and when he showed that bill to Dr. Shields, and that the secretary had reported to the board the fact that he had received that bill from appellee, and that each of the directors had looked at it and read the same, would not ordinary prudence have prompted an inquiry as to why such a claim was being made and why they were being asked to pay it? Does any one suppose such an inquiry would not have been made? This bill was received by

appellant's secretary under such circumstances that the law says appellant at that time became possessed of all the knowledge that the secretary had. If the directors at that time had made inquiry of Kaufman and Shields, as did the secretary, it is only reasonable to assume that Kaufman and Shields could have given them some information concerning the installation of the sprinkler system. Suppose that, at that meeting, when Billings, Honan, Kaufman and Shields were present, they had been interrogated about the matter, is it not reasonable to suppose that Shields would have informed them that he had signed two separate documents, one in the presence of Billings, the vice-president and a director of appellant, and the other in the presence of another director, Honan, who had taken his acknowledgment to one of the papers. With such information, would it not be reasonable to suppose they would have made some inquiry of appellee concerning the bill, and as to why it was sent to them and not the shoe company or Sam B. Wolf, Jr., who held the lease of the building? Appellant, upon the receipt of the bill, had notice that appellee was installing the sprinkler in its building and was looking to it for the payment of the cost of the same. It knew, as a matter of law, that, if it had done no more than sign a consent to the installation of the sprinkler in its building, a mechanic's lien would attach to its property and create a liability that it might be called upon to pay in order to prevent a sale of its property to discharge the lien. Does any one suppose that Honan, with his knowledge of the law, would not have informed them of the possible dangers of remaining silent and taking no action in relation to the bills? The secretary, however, instead of taking the matter up with the board as he said he usually did with any matter of importance, deeming this matter of little or no importance, put this bill with others received later in his desk and gave them

no further attention, not even mentioning the receipt of any except the first to any one. He was acting for appellant, and by his acts the appellant is bound. His silence and failure to act, when he should have spoken and acted, must and will be imputed to appellant. As was said in *Reagan* v. *First National Bank* (1901), 157 Ind. 623, 677, 61 N. E. 575; "Where a person has notice of such facts or circumstances which ought to put him upon inquiry, but, instead of doing so, studiously avoids making any inquiry, the law will impute to him notice of such facts as he could have ascertained had he exercised ordinary diligence."

Appellee had a contract signed by appellant by its president. The signature was witnessed by a third party. The president had acknowledged the execution of the contract. Relying upon the legality of this contract, and having no notice or knowledge that the president had no authority to execute the contract, appellee, in good faith, proceeded to carry out the terms of the contract by shipping the materials for the installation of the sprinkler system, and, before any of the materials have been placed in the building, sent a bill to appellant for that part of the contract price which, according to the contract, was then due, and not having any notice from appellant questioning the correctness of the bill or indicating that it was not properly chargeable to and would not be paid by appellant, installed the material in the building, enhancing its value. The chief executive officers, in fact, all of the executive officers, of appellant, viz.: its president, vice-president and its secretary-treasurer, and doubtless other directors, possessed knowledge that a sprinkler system was being installed or that contracts and agreements had been executed for that purpose. And when we add that the articles of incorporation did not limit or define the duties and powers of its president, the contradictory and un-

certain character of the testimony of appellant's witnesses, we are strongly impressed with the conviction that the trial court had the right to find and was amply justified in finding, that the contract sued on was executed by Shields as president of appellant, and that even though its execution had never been formally authorized by the board of directors, appellant, by its subsequent acts and by its silence after it knew appellee was looking to it for payment, was guilty of such negligence as to estop it to deny its liability on such contract.

Appellant calls attention to the fact that it had leased the property for a term of years and that the tenant was, during the tenancy, required to keep the property insured, and says there was no reason why it should be interested in the installation of the sprinkler system and the reduction of insurance rates. This contention is beside the questions presented in this court and is of no controlling influence. That contention was proper for the consideration of the trial court in determining whether the contract had been signed by Dr. Shields, acting for appellant. It has no bearing on the question of estoppel. And if it had, the legal title to the property was in appellant, and it had no assurance the tenant would carry out the terms of the contract or exercise the option to buy the property. And there is some evidence that, after the contract had been signed by Shields, Sam B. Wolf, Jr., the Wolf Shoe Company, or some one connected with them, undertook to refinance the sprinkler contract so as to relieve appellant from the obligation incurred by reason of the contract in question, and that it was in connection with that matter that the so-called "consent" was signed by Shields in the presence of Billings at the bank.

It was not necessary for appellee to prove that appellant authorized the execution of the contract by Dr.

Shields. It was sufficient if it was proved that
it subsequently ratified the contract. It was not
necessary, however, to prove this by a *direct vote*
or *resolution* of the company. As was said in *Grape
Sugar, etc., Mfg. Co.* v. *Small* (1874), 40 Md. 395: "It
being conceded that corporations of this kind, acting
within the scope of their corporate powers, may make
contracts through their officers or agents, there is no
reason in principle or justice, why the same presumption
should not arise, and the same duties and responsibilities
attach upon such contracts, as in case of contracts made
by *natural persons.*" And this rule has been applied to
municipal corporations acting within the scope of their
powers. *County of Randolph* v. *Post, supra.* See, also,
*Kneeland* v. *Gilman* (1869), 24 Wis. 39; *Simplot* v. *City
of Dubuque* (1878), 49 Iowa 650; *Brandirff* v. *Harrison
Co.* (1878), 50 Iowa 164; *Adams Co.* v. *B. & M. R. Co.*
(1874), 39 Iowa 507.

Whether ratification or estoppel exists or not is a
question of fact where more than one inference can be
drawn from the evidence. *Nelson* v. *Wentworth*
(1923), 243 Mass. 377, 137 N. E. 646; *Tune* v.
*Beeland* (1908), 131 Ga. 528, 62 S. E. 976;
*Harlow* v. *Jaseph* (1914), 183 Mich. 500, 149 N. W.
1047; *Nelson* v. *Caldo-Texas, etc., Co.* (1922), 176 Wis.
327, 186 N. W. 155. And, like any other question, when
the evidence is such that a reasonable person can draw
one of two inferences from the evidence, the finding of
the trial court upon that question is binding on this
court, and we cannot, without violating a well-settled
rule of law, overthrow the finding of the trial court.
*City of Linton* v. *Jones* (1921), 75 Ind. App. 320, 326,
130 N. E. 541.

Appellant's silence when it received the bills from
appellee and when it learned appellee was looking to it
for payment, and when it should have spoken, is suffi-

cient to sustain the decision of the trial court in holding that appellant was estopped to deny its liability on the contract. The trial court saw the witnesses and heard them testify, and was in a better position to weigh the testimony of the several witnesses than we are, and it might have been justified in finding that Dr. Shields had the implied authority to sign the contract in question and that he did so after the alterations had been made.

The court did not err in allowing the contract sued on, and the bills sent to appellant to be introduced in evidence.

No reversible error being shown, the judgment is affirmed.

Nichols, J., not participating.

Dausman, J., absent.